912 A.2d 88

JALIYAH MUHAMMAD, ON HER OWN BEHALF AND ALL OTH-
ERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v.
COUNTY BANK OF REHOBOTH BEACH, DELAWARE AND
MAIN STREET SERVICE CORPORATION, DEFENDANTS–RE-
SPONDENTS, AND EASYCASH, TELECASH, JOHN DOE AND
JOHN ROE, DEFENDANTS.

Argued February 14, 2006—Decided August 9, 2006.

2

4

*Michael J. Quirk,* a member of the New York and District of Columbia bars, argued the cause for appellant (*Trujillo, Rodriguez & Richards* and *Williams, Cuker & Berezofsky,* attorneys; *Mr. Quirk, Donna Siegel Moffa* and *Mark R. Cuker,* on the briefs).

*Marc J. Zucker* and *Claudia T. Callaway,* a member of the District of Columbia bar, argued the cause for respondents (*Weir & Partners,* attorneys for County Bank of Rehoboth Beach, Delaware and *Sweeney & Sheehan,* attorneys for Main Street Service Corporation; *Mr. Zucker, Ms. Callaway, Susan M. Verbonitz, John Michael Kunsch,* on the briefs).

*David G. McMillin* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Mr. McMillin, Mr. Miller* and *Christopher Hill,* on the brief).

*Jeffrey C. Burstein,* Assistant Attorney General, argued the cause for amici curiae Attorney General of New Jersey and The New Jersey Division of Consumer Affairs (*Zulima V. Farber,* Attorney General, attorney; *Mr. Burstein* and *Carol G. Jacobson,* Deputy Attorney General, on the brief).

*David M. Gossett,* a member of the Illinois and District of Columbia bars, argued the cause for amicus curiae Chamber of Commerce of the United States of America (*Drinker Biddle & Reath,* attorneys; *Mr. Gossett, Evan M. Tager,* a member of the New York and District of Columbia bars, *Robin S. Conrad,* a member of the District of Columbia bar, *Amar D. Sarwal,* a member of the District of Columbia bar, of counsel; *Andrew B. Joseph,* on the brief).

*William J. Pinilis* submitted a brief on behalf of amici curiae AARP, Consumers League of New Jersey and National Association of Consumer Advocates.

*Marvin J. Brauth* and *Jeffrey J. Brookner* submitted a brief on behalf of amicus curiae New Jersey Business and Industry Association (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Brauth,* of counsel; *Mr. Brauth and Mr. Brookner,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal we must determine whether a provision in an arbitration agreement that is part of a consumer contract of adhesion is unconscionable and therefore unenforceable because it forbids class-wide arbitration. Plaintiff entered into a short-term loan agreement, the terms of which she claims violate the State's consumer-fraud statutes. Her complaint includes allegations that the State's civil usury limits are being evaded in loan transactions such as hers by means of a conspiracy involving complex financial dealings among out-of-state financial entities. The damages allegedly caused by such transactions are small on an individual-by-individual basis, but are substantial when aggregated into a class claim. Plaintiff seeks, therefore, to pursue a class action and is willing to pursue her class-wide claim in the arbitral forum but for the arbitration agreement's class-arbitration bar. Both the trial court and the Appellate Division found the class-arbitration bar enforceable.

Applying the controlling test for determining unconscionability for contracts of adhesion set forth in *Rudbart v. North Jersey*

*District Water Supply Commission,* 127 *N.J.* 344, 605 *A.*2d 681, *cert. denied,* 506 *U.S.* 871, 113 *S.Ct.* 203, 121 *L.Ed.*2d 145 (1992), we hold that the class-arbitration waiver in this consumer contract is unenforceable. Such a waiver would be unconscionable whether applied in a lawsuit or in arbitration. We further conclude that the appropriate remedy in these circumstances is to sever the unconscionable provision and enforce the otherwise valid arbitration agreement.

I.

Defendant County Bank of Rehoboth Beach, Delaware (County Bank) is a federally-insured depository institution chartered under Delaware law. Defendant Main Street Service Corp. (Main Street) is a loan servicer for County Bank. Main Street operates a telephone service center in Pennsylvania. Defendants Easy Cash and Telecash are registered trade names of County Bank.

On May 23, 2003, plaintiff Jaliyah Muhammad, a part-time student at Berkeley College in Paramus, received a short-term, single advance, unsecured loan of $200 from County Bank. According to the terms of the LOAN NOTE AND DISCLOSURE form that Muhammad signed, the principal, along with a finance charge of sixty dollars, was due on June 13, 2003. The annual percentage rate listed on the loan note was 608.33%. According to Muhammad, she twice extended the loan (with a sixty dollar finance charge each time) because she could not repay it, resulting in a total of $180 in finance charges. Those facts are unchallenged by defendants. Muhammad also obtained two similar loans from County Bank, dated April 28, 2003 and June 6, 2003.

Muhammad had to complete and return three pages of standard form contracts in order to receive a loan. The first two pages, entitled "LOAN APPLICATION," were signed by Muhammad on April 28, 2003. Muhammad did not have to complete that form again in connection with the loans made on May 23, 2003 and June 6, 2003. The first page of the LOAN APPLICATION requested

general personal information. The second page contained the relevant provisions concerning arbitration:

> AGREEMENT TO ARBITRATE ALL DISPUTES: By signing below and to induce us, County Bank of Rehoboth Beach, Delaware, to process your application for a loan, you and we agree that any and all claims, disputes or controversies that we or our servicers or agents have against you or that you have against us, our servicers, agents, directors, officers and employees, that arise out of your application for a loan, the Loan Note or Agreement that you must sign to obtain the loan, this agreement to arbitrate all disputes, collection of the loan, or alleging fraud or misrepresentation, whether under the common law or pursuant to federal or state statute or regulation, including the matters subject to arbitration, *or otherwise, shall be resolved by binding individual (and not class) arbitration* by and under the Code of Procedures of the National Arbitration Forum ("NAF") in effect at the time the claim is filed. This agreement to arbitrate all disputes shall apply no matter by whom or against whom the claim is filed....

> > NOTICE: YOU AND WE WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.

> AGREEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS ACTIONS: To the extent permitted by law, by signing below you agree that you will not bring, join or participate in any class action as to any claim, dispute or controversy you may have against us or our agents, servicers, directors, officers and employees. You agree to the entry of injunctive relief to stop such a lawsuit or to remove you as a participant in the suit. You agree to pay the costs we incur, including our court costs and attorney's fees, in seeking such relief. This agreement is not a waiver of any of your rights and remedies to pursue a claim individually and not as a class action in binding arbitration as provided above. This agreement not to bring or participate in class action suits is an independent agreement and shall survive the closing and repayment of the loan for which you are applying.

[(Emphasis added).]

Above the signature line, the LOAN APPLICATION also stated that "[b]y signing below you also agree to the Agreement to Arbitrate All Disputes and the Agreement Not To Bring, Join or Participate In Class Actions...."

In respect of the May 23, 2003 loan, Muhammad also executed a LOAN NOTE AND DISCLOSURE form that included the following language.

> AGREEMENT TO ARBITRATE ALL DISPUTES: You and we agree that any and all claims, disputes or controversies between you and us and/or the Company, any claim by either of us against the other or the Company (or the employees, officers, directors, agents or assigns of the other or the Company) and any claim

arising from or relating to your application for this loan or any other loan you previously, now or may later obtain from us, this Loan Note, this agreement to arbitrate all disputes, your agreement not to bring, join or participate in class actions, regarding collection of the loan, alleging fraud or misrepresentation, whether under the common law or pursuant to federal, state or local statutes, regulation or ordinance, including disputes as to the matters subject to arbitration, or otherwise, *shall be resolved by binding individual (and not joint) arbitration* by and under the Code of Procedure of the National Arbitration Forum ("NAF") in effect at the time the claim is filed. This agreement to arbitrate all disputes shall apply no matter by whom or against whom the claim is filed.... This arbitration agreement is made pursuant to a transaction involving interstate commerce. It shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1–16....

> NOTICE: YOU AND WE WOULD HAVE HAD A RIGHT OR OPPORTUNI-TY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.

*AGREEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS AC-TIONS:* To the extent permitted by law, you agree that you will not bring, join or participate in any class action as to any claim, dispute or controversy you may have against us, our employees, officers, directors, servicers and assigns. You agree to the entry of injunctive relief to stop such a lawsuit or to remove you as a participant in the suit. You agree to pay the attorney's fees and court costs we incur in seeking such relief. This Agreement does not constitute a waiver of any of your rights and remedies to pursue a claim individually and not as a class action in binding arbitration as provided above.

[(Emphasis added).]

If that were not clear enough, directly above the signature line, the LOAN NOTE AND DISCLOSURE form also stated, that "BY SIGNING BELOW, YOU AGREE TO ALL OF THE TERMS OF THIS NOTE, INCLUDING THE AGREEMENT TO ARBITRATE ALL DISPUTES AND THE AGREEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS AC-TIONS."

Thus, the contracts signed by Muhammad contain two types of class-action prohibitions. The first, referred to herein as the "class-arbitration waivers," are found within the text of the arbitration clauses and highlighted above. They specifically bar class claims in arbitration. The second, referred to herein as the "broad class-action waivers," are separate from the arbitration clauses and prohibit Muhammad from bringing or participating in

class-action suits brought in court as well as class claims brought in arbitration.

In February 2004, Muhammad filed a putative class-action suit in New Jersey Superior Court against County Bank, Easy Cash, Telecash, Main Street, John Doe, and John Roe. The complaint alleged that Easy Cash, Telecash, and Main Street violated the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–2, the civil usury statute, *N.J.S.A.* 31:1–1, and the New Jersey RICO statute, *N.J.S.A.* 2C:41–1, by charging, and conspiring to charge, illegal rates of interest. The complaint further alleged that County Bank aided and abetted the unlawful conduct of the other defendants by renting out its name and status without actually funding or meaningfully participating in the loans. Muhammad requested injunctive relief, restitution, damages, penalties, and costs.

Defendants removed the action to federal district court, but because Muhammad's claims were determined by that court not to be preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 *U.S.C.A.* § 1831d, the case was remanded to state court. Defendants thereupon filed a motion to compel arbitration and to stay the action pending arbitration. They also filed a motion requesting a protective order in respect of discovery. Muhammad opposed defendants' motions and filed a cross-motion concerning discovery. Muhammad argued that the arbitration agreement was unconscionable based on the class-action waiver, discovery limitations in NAF's rules, the costs of the arbitration, and the bias inherent in NAF as an arbitration forum.[1] In response, defendants offered to arbitrate Muhammad's claims in the American Arbitration Association rather than the NAF—an offer that Muhammad rejected.

---

[1] If the parties fail to agree on discovery matters, *NAF Rule* 29C allows mandatory discovery where the "cost [of discovery] is commensurate with the amount of the Claim." Muhammad contends that because her damages are only $180, limiting discovery to that amount, in the context of a complex claim, precludes her from obtaining relief.

The trial court granted defendants' motion to compel arbitration pursuant to the Federal Arbitration Act (FAA), 9 *U.S.C.A.* § 4, and stayed the case pending arbitration. Muhammad filed a motion for leave to appeal, which was granted. In a published decision, the Appellate Division affirmed the trial court. *Muhammad v. County Bank of Rehoboth Beach,* 379 *N.J.Super.* 222, 877 *A.*2d 340 (App.Div.2005). Applying *Rudbart, supra,* 127 *N.J.* at 353, 605 *A.*2d 681, the panel concluded that the arbitration agreement was not unconscionable. *Muhammad, supra,* 379 *N.J.Super.* at 237–48, 877 *A.*2d 340. In upholding the class-arbitration bar specifically, the Appellate Division relied on its earlier decision in *Gras v. Associates First Capital Corp.,* 346 *N.J.Super.* 42, 786 *A.*2d 886 (2001), *certif. denied,* 171 *N.J.* 445, 794 *A.*2d 184 (2002), which, the panel believed, "directly address[ed]" the class-action waiver issue. *Muhammad, supra,* 379 *N.J.Super.* at 244–48, 877 *A.*2d 340. Judge Kestin filed a separate concurring opinion. *Id.* at 249, 877 *A.*2d 340.

Plaintiff filed a motion for leave to appeal, which we granted. 185 *N.J.* 254, 883 *A.*2d 1054 (2005). Legal Services of New Jersey filed a brief as amicus curiae in support of Muhammad. AARP, the Consumers League of New Jersey, and the National Association of Consumer Advocates filed a joint brief in support of Muhammad. Also, the Attorney General on behalf of the New Jersey Division of Consumer Affairs filed a brief in Muhammad's support. The Chamber of Commerce of the United States of America and the New Jersey Business and Industry Association filed amicus briefs in support of defendants.

## II.

### A.

Congress enacted the FAA, 9 *U.S.C.A.* §§ 1–16, "to abrogate the then-existing common law rule disfavoring arbitration agreements 'and to place arbitration agreements upon the same footing as other contracts.'" *Martindale v. Sandvik, Inc.,* 173 *N.J.*

76, 84, 800 *A.*2d 872 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 *U.S.* 20, 24, 111 *S.Ct.* 1647, 1651, 114 *L.Ed.*2d 26, 36 (1991)). Section 2 of the FAA provides that arbitration agreements covered by the Act "shall be valid, irrevocable, and enforceable save upon grounds as exist at law or in equity for the revocation of any contract." 9 *U.S.C.A.* § 2. "In enacting section 2 of the FAA, 'Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" *Martindale, supra,* 173 *N.J.* at 84, 800 *A.*2d 872 (quoting *Southland Corp. v. Keating,* 465 *U.S.* 1, 10, 104 *S.Ct.* 852, 858, 79 *L.Ed.*2d 1, 12 (1984)). The FAA, however, does not preclude an examination into whether the arbitration agreement at issue is unconscionable under state law. *Id.* at 85–86, 800 *A.*2d 872.

 "[G]enerally applicable contract defenses, such as fraud, duress, or *unconscionability,* may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs., Inc. v. Casarotto,* 517 *U.S.* 681, 687, 116 *S.Ct.* 1652, 1656, 134 *L.Ed.*2d 902, 909 (1996) (emphasis added); *see also Discover Bank v. Superior Court,* 36 *Cal.*4th 148, 30 *Cal.Rptr.*3d 76, 113 *P.*3d 1100, 1112–13 (2005) (stating that "the FAA does not federalize the law of unconscionability or related contract defenses except to the extent that it forbids the use of such defenses to discriminate against arbitration clauses."). Furthermore, "whether the parties have a valid arbitration agreement at all" is a "gateway" question that requires judicial resolution. *Green Tree Fin. Corp. v. Bazzle,* 539 *U.S.* 444, 452, 123 *S.Ct.* 2402, 2407, 156 *L.Ed.*2d 414, 422 (2003) (plurality opinion).

 It is clear that under *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 *U.S.* 395, 403–04, 87 *S.Ct.* 1801, 1806, 18 *L.Ed.*2d 1270, 1277 (1967), "a court must decide whether [an] agreement to arbitrate is valid." *Barker v. Golf U.S.A., Inc.,* 154 *F.*3d 788, 791 (8th Cir.1998), *cert. denied,* 525 *U.S.* 1068, 119 *S.Ct.* 796, 142 *L.Ed.*2d 659 (1999). That said, were this contract

silent or ambiguous about the availability of class-wide arbitration, an arbitrator would have to resolve the question of contract interpretation. *See Bazzle, supra,* 539 *U.S.* at 451, 123 *S.Ct.* at 2407, 156 *L.Ed.*2d at 422 (holding that when arbitration agreement is silent on subject, arbitrator is to decide "whether the agreement forbids class arbitration"). The instant agreement is not silent, however, or even ambiguous as to the availability of class arbitration. Not only does the LOAN NOTE AND DISCLOSURE FORM state that all disputes "shall be resolved by binding individual (and not joint) arbitration," but the April 28, 2003 LOAN APPLICATION also states all disputes "shall be resolved by binding individual (and not class) arbitration." Both documents also reference the NAF rules of procedure, which bar class-wide arbitrations unless all parties consent. *See NAF Rule* 19(a). Furthermore, in addition to the class-arbitration waivers found in the arbitration agreements themselves, the broad class-action waivers found elsewhere in the contracts also contain clear and unmistakable language prohibiting Muhammad's use of a class mechanism.

Other courts similarly have distinguished *Bazzle.* For example, in *Gipson v. Cross Country Bank,* 354 *F.Supp.*2d 1278, 1286 (M.D.Ala.2005), the court, in the course of upholding a particular class-arbitration waiver, stated that

[t]he contract before this court now is distinguishable from the one in *Bazzle,* because here the clause prohibiting class arbitration is clear, that is, there is no issue of contract interpretation as there was in *Bazzle.* Put another way, the Court plurality in *Bazzle* felt that the answer as to whether the contracts allowed or prohibited class arbitration was "not completely obvious," hence contract interpretation, which is the realm of the arbitrator, would be necessary. Here, however, an arbitrator need not interpret the contract's class action waiver clause, because the contract expressly prohibits class arbitration, thereby concerning "the validity of the arbitration clause," which the *Bazzle* plurality indicated could fall under the narrow exception concerning matters "contracting parties would likely have expected a court" to decide. There is no need for anyone to decide "whether the contract[ ] forbid[s] class arbitration." It expressly and unequivocally does. The only issue is whether such a clear prohibition is valid and enforceable....

[(Citations omitted).]

For completeness we note defendants' argument that Muhammad's claims must fail because her challenge to the class-action waiver should be viewed as a challenge to the contract as a whole, and not as a specific challenge to the arbitration agreement. *Prima Paint, supra,* 388 *U.S.* 395, 87 *S.Ct.* 1801, 18 *L. Ed.*2d 1270, and *Buckeye Check Cashing, Inc. v. Cardegna,* 546 *U.S.* 440, 126 *S.Ct.* 1204, 163 *L.Ed.*2d 1038 (2006), hold that because arbitration agreements are, as a matter of federal arbitration law, severable from the remainder of a contract, a challenge to a contract as a whole is for an arbitrator to decide. In this matter, however, there are two types of class-action waivers in the contracts Muhammad signed: the class-arbitration waivers and the broad class-action waivers. The broad class-action waivers could be considered distinct from the arbitration agreement in the contracts, and thus could be considered part of the "contract as a whole." In that circumstance, under *Prima Paint* and *Buckeye,* an arbitrator would address the unconscionability of the broad class-action waivers. That situation is not before us, however, because there are distinct class-arbitration waivers within the arbitration clauses of both the LOAN NOTE AND DISCLOSURE form and the APPLICATION. Those class-arbitration waivers, based on their location and subject matter, are part of the arbitration agreements, and not part of the contracts as a whole. As such, we are empowered to address this challenge.

Because federal arbitration law does not prevent us from examining the validity of the class-arbitration waiver, we turn then to our own state law requirements in respect of contract unconscionability.[2]

---

[2] The Appellate Division concluded that defendants had waived any argument that Delaware law should be applied (based on a choice of law clause in the contract). The panel found the issue to have been waived because it was not raised before the trial court and was raised only in a footnote in defendants' Appellate Division brief. *Muhammad, supra,* 379 *N.J.Super.* at 234 n. 3, 877 *A.*2d 340. Defendants did not seek review of the Appellate Division's determination of that issue.

## B.

It is well settled that courts "may refuse to enforce con-tracts that are unconscionable." *Saxon Constr. & Mgmt. Corp. v. Masterclean of N.C., Inc.,* 273 *N.J.Super.* 231, 236, 641 *A.*2d 1056 (App.Div.), *certif. denied,* 137 *N.J.* 314, 645 *A.*2d 142 (1994); *see also N.J.S.A.* 12A:2–302 (adopting Uniform Commercial Code provision recognizing unconscionability as basis for voiding contract or clause therein). The seminal case of *Rudbart, supra,* set out factors for courts to consider when determining whether a specific term in a contract of adhesion is unconscionable and unenforceable. 127 *N.J.* at 356, 605 *A.*2d 681. In *Rudbart, supra,* this Court recognized that adhesion agreements necessarily involve indicia of procedural unconscionability. *Ibid.; see generally Sitogum Holdings, Inc. v. Ropes,* 352 *N.J.Super.* 555, 564–66, 800 *A.*2d 915 (Ch.Div.2002) (observing that unconscionability traditionally entails discussion of two factors: procedural unconscionability, which "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process," and substantive unconscionability, which generally involves harsh or unfair one-sided terms). *Rudbart, supra,* notes that "the essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." 127 *N.J.* at 353, 605 *A.*2d 681.

The determination that a contract is one of adhesion, however, "is the beginning, not the end, of the inquiry" into whether a contract, or any specific term therein, should be deemed unenforceable based on policy considerations. *Id.* at 354, 605 *A.*2d 681. A sharpened inquiry concerning unconscionability is necessary when a contract of adhesion is involved.

[I]n determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to [ (1)] the subject matter of the contract, [ (2)] the parties'

relative bargaining positions, [ (3)] the degree of economic compulsion motivating the "adhering" party, and [ (4)] the public interests affected by the contract.

[*Id.* at 356, 605 *A.2d* 681.]

Because adhesion contracts invariably evidence some characteristics of procedural unconscionability, the Court required a careful fact-sensitive examination into substantive unconscionability.[3] *Ibid.* *Rudbart's* multi-factor analysis generally conforms to the case-by-case approach widely used for evaluating claims of unconscionability. *See Cheshire Mortg. Serv. v. Montes,* 223 *Conn.* 80, 612 *A.2d* 1130, 1135 (1992) (stating that, under the UCC, "[t]he determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances.").

## C.

The unconscionability issue in this matter centers on access to a class-wide proceeding in the arbitral setting. Although class arbitration specifically has never before been examined by this Court, the merits of the class-action procedure have been acknowledged many times in the context of court litigation. "By permitting claimants to band together, class actions equalize adversaries and provide a procedure to remedy a wrong that might otherwise go unredressed." *In re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 424, 461 *A.2d* 736 (1983). "If each victim were remitted to an individual suit, the remedy could be illusory, for the individual loss may be too small to warrant a suit. . . . Thus the wrongs would go without redress, and there would be no deterrence to further

---

[3] This is not to say that when a contract of adhesion involves overwhelming procedural unconscionability, that those procedural factors are not included and weighed in the overall analysis for unconscionability. *See, e.g., Discover Bank, supra,* 36 *Cal.*4th 148, 30 *Cal.Rptr.*3d 76, 113 *P.*3d 1100 (finding gross unfairness in contract formation when bill stuffer contained adhesion contract's terms). In that circumstance a "sliding scale" analysis may be appropriate. *See Sitogum Holdings Inc., supra,* 352 *N.J.Super.* at 565–66, 800 *A.2d* 915 (noting that courts have employed a "sliding scale" analysis when considering, in tandem, the two factors of procedural and substantive unconscionability). `

aggressions." *Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 225, 294 *A.*2d 7 (1972). Other courts have referred to such small damage cases as "negative value" suits recognizing that they "would be uneconomical to litigate individually." *In re Monumental Life Ins. Co.*, 365 *F.*3d 408, 411 n. 1 (5th Cir.2004).

The class-action vehicle remedies the incentive problem facing litigants who seek only a small recovery. "[A] class action can produce a substantial fund to compensate . . . [the class members'] attorney for his services." *In re Cadillac, supra*, 93 *N.J.* at 424, 461 *A.*2d 736. A "substantial fund" not only covers the attorney's actual fees, but also provides incentive in the form of possible contingency fees for attorneys to risk the prospect of receiving no recovery for their efforts. *See Amchem Products, Inc. v. Windsor*, 521 *U.S.* 591, 617, 117 *S.Ct.* 2231, 2246, 138 *L.Ed.*2d 689, 709 (1997) (stating that "[a] class action solves [the incentive problem created by small damages] by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."); *Eisen v. Carlisle & Jacquelin*, 417 *U.S.* 156, 161, 94 *S.Ct.* 2140, 2144, 40 *L.Ed.*2d 732, 739 (1974) (stating that "[n]o competent attorney would undertake this complex antitrust action to recover so inconsequential an amount [as $70]."). The class-action mechanism also overcomes the problem that small individual recoveries may fail to provide an adequate incentive for a litigant to investigate a claim or bring suit even if the litigant could secure representation. *See Varacallo v. Mass. Mutual Life Ins. Co.*, 226 *F.R.D.* 207, 234 (D.N.J.2005) (stating that "[a]bsent class certification, very few individuals would have the incentive . . . to bring individual claims"). And, not least of all, there is the additional justification that a class-action proceeding "can aid the efficient administration of justice by avoiding the expense, in both time and money, of relitigating similar claims." *In re Cadillac, supra*, 93 *N.J.* at 435, 461 *A.*2d 736.

In sum, the class-action mechanism is recognized to be valuable to litigants, to the courts, and to the public interest. Class actions fulfill the policies of this State even when only a

small amount of damages is at stake. Not surprisingly, in light of the importance of its role generally, and specifically in recognition of its usefulness in connection with small-damages actions such as are often the case in consumer suits, this Court has instructed that "the class action rule should be construed liberally in a case involving allegations of consumer fraud." *Ibid.; see also Strawn v. Canuso,* 140 *N.J.* 43, 68, 657 *A*.2d 420 (1995) (stating that "a class action is the superior method for adjudication of consumer-fraud claims"); *Riley, supra,* 61 *N.J.* at 228, 294 *A*.2d 7 (stating that "a court should be slow to hold that a suit [under the CFA] may not proceed as a class action."). With those justifications for the class-action vehicle in mind we turn to consider the unconscionability of the contractual waiver of class-wide arbitration before us.

## III.

### A.

The arbitration agreement signed by Muhammad is clearly a contract of adhesion. We, therefore, must apply *Rudbart*'s four factors, as did the Appellate Division, in order to determine whether New Jersey contract law principles permit enforcement of the class-arbitration prohibitions found in the instant arbitration agreements.

The first three factors of the *Rudbart* analysis require only brief attention. In respect of subject matter, the circumstantial backdrop to our *Rudbart* inquiry is the payday loan agreement executed between the parties. The focus of our analysis, however, is on the agreement's mandatory arbitration provision that contains limits on discovery and bars class-wide arbitration. In respect of *Rudbart*'s second factor, the gross disparity in the relative bargaining positions of the parties is self-evident from the nature of the payday loan contract between a consumer and a

financial entity.[4] We add only that the contract Muhammad entered into is, in its most general sense, a consumer contract. Although those facts, in addition to our finding that the contract is one of adhesion, indicate a degree of procedural unconscionability in Muhammad's contract, they are insufficient to render the contract unenforceable. That said, adhesive consumer contracts, which are ordinarily enforceable, nonetheless may rise to the level of unconscionability when substantive contractual terms and conditions impact "public interests" adversely.

*Rudbart's* fourth factor, the most important to the present analysis, considers "the public interests affected by the contract." That factor requires us to determine whether the effect of the class-arbitration bar is to prevent plaintiff from pursuing her statutory consumer protection rights and thus to shield defendants from compliance with the laws of this State. Those "public interest" considerations ultimately determine whether we can permit enforcement of the provision in plaintiff's contract that allegedly precludes any realistic challenge to the substance of her loan-contract's terms.

In New Jersey, exculpatory waivers that seek a release from a statutorily imposed duty are void as against public policy. *McCarthy v. NASCAR, Inc.,* 48 *N.J.* 539, 542, 226 *A.*2d 713 (1967). Muhammad's claims are statutory; however, the class-arbitration waiver at issue, and class-action waivers in general, are not, in the strictest sense of the term, exculpatory clauses. *See Discover Bank, supra,* 30 *Cal.Rptr.*3d 76, 113 *P.*3d at 1108. The class-arbitration waiver does not preclude Muhammad from filing an individual claim in arbitration. The difficulty lies in the

---

[4] The third *Rudbart* factor addresses the degree of economic compulsion motivating the "adhering" party. In respect of that factor we note only that payday loans may be necessities for persons who need access to cash and who may have credit difficulty, compelling their acquiescence to loans bearing exorbitant interest rates. Muhammad seeks to represent a class of people who, like herself, are under an allegedly high degree of economic compulsion to enter into such loan contracts.

fact that her individual consumer-fraud case involves a small amount of damages, rendering individual enforcement of her rights, and the rights of her fellow consumers, difficult if not impossible. In such circumstances a class-action waiver can act effectively as an exculpatory clause.

> To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent.
>
> [*Delgozzo v. Kenny*, 266 *N.J.Super.* 169, 193, 628 *A.*2d 1080 (App.Div.1993) (quoting *Hohmann v. Packard Instrument Co.*, 399 *F.*2d 711, 715 (7th Cir.1968)).]

Such waivers are problematic "when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties *predictably* involve small amounts of damages," as the California Supreme Court also recognized. *Discover Bank, supra*, 30 *Cal.Rptr.*3d 76, 113 *P.*3d at 1110 (emphasis added).

In most cases that involve a small amount of damages, "rational" consumers may decline to pursue individual consumer-fraud lawsuits because it may not be worth the time spent prosecuting the suit, even if competent counsel was willing to take the case. *See Kinkel v. Cingular Wireless, L.L.C.*, 357 *Ill.App.*3d 556, 564, 293 *Ill.Dec.* 502, 510, 828 *N.E.*2d 812, 820 (observing that in context of individually pursued small damage claims, any potential recovery would be offset "by any costs incurred in presenting the claim and any lost wages for taking time from work to do so."), *appeal granted*, 216 *Ill.*2d 690, 298 *Ill.Dec.* 378, 839 *N.E.*2d 1025 (2005); *see also Carnegie v. Household Int'l, Inc.*, 376 *F.*3d 656, 661 (7th Cir.2004) (commenting that "only a lunatic or a fanatic sues for $30."). Moreover, without the availability of a class-action mechanism, many consumer-fraud victims may never realize that they may have been wronged. As commentators have noted,

> often consumers do not know that a potential defendant's conduct is illegal. When they are being charged an excessive interest rate or a penalty for check bouncing, for example, few know or even sense that their rights are being violated. Nor,

given the relatively small amounts at stake, would most consumers find it worthwhile to seek legal advice to determine whether this is the case.

[Jean R. Sternlight and Elizabeth J. Jensen, *Mandatory Arbitration: Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse*, 67 *Law & Contemp. Prob.* 75, 88 (2004).]

In addition to their impact on individual litigants, class-action waivers can functionally exculpate wrongful conduct by reducing the possibility of attracting competent counsel to advance the cause of action. Class-action waivers prevent an aggregate recovery that can serve as a source of contingency fees for potential attorneys. Although defendants have no obligation to provide counsel to plaintiff, they cannot take action that impedes ordinary citizens' access to representation to vindicate their rights. Defendants emphasize the availability of attorney's fees under the CFA; however, that fact is not dispositive in the instant case because the damages sought by Muhammad and those she seeks to represent are small. The availability of attorney's fees is illusory if it is unlikely that counsel would be willing to undertake the representation. The finance charge for the loan in this matter was $60. The class of people whom plaintiff seeks to represent may have similar claims about that size. In fact, plaintiff had to roll-over her loan two times, bringing her compensatory claims to $180 that, with the possibility of treble damages available under CFA, may add up to a maximum of less than $600. One may be hard-pressed to find an attorney willing to work on a consumer-fraud complaint involving complex arrangements between financial institutions of other jurisdictions when the recovery is so small.[5]

---

[5] In many respects, this is a fact-sensitive analysis and close cases may require the development of some proofs by a putative class plaintiff and fact-finding on the court's part. *See* Sternlight and Jensen, *supra*, 67 *Law & Contemp. Prob.* at 87 (stating that "[t]estimony from parties, local attorneys, or experts can establish which claims plaintiffs and their attorneys deem worth bringing. Such testimony needs to be specific as to what kinds of damages and attorney's fees would be available for individual claims [and] why these are insufficient"). At some point, an amount of damages will be high enough to attract counsel if attorney's fees are available, even though no counsel would take the same case if no attorney's fees were available. When "substantial damages" are at stake, the

It cannot be that class-action waivers are less objectionable when a plaintiff is suing under a statute that *fails* to provide for attorney's fees (and damages multipliers). Such a perverse result would encourage under-enforcement of the very statutes that the Legislature has signaled as warranting strenuous enforcement.

We hold, therefore, that the presence of the class-arbitration waiver in Muhammad's consumer arbitration agreement renders that agreement unconscionable. As a matter of generally applicable state contract law, it was unconscionable for defendants to deprive Muhammad of the mechanism of a class-wide action, whether in arbitration or in court litigation. The public interest at stake in her ability and the ability of her fellow consumers effectively to pursue their statutory rights under this State's consumer protection laws overrides the defendants' right to seek enforcement of the class-arbitration bar in their agreement.

We do not view our holding today to be at odds with the decision in *Gras v. Associates First Capital Co.*, 346 *N.J.Super.* 42, 786 *A.*2d 886 (2001), *certif. denied*, 171 *N.J.* 445, 794 *A.*2d 184 (2002), in which the Appellate Division considered the issue before it to be whether class-action waivers were per se unenforceable. The court in *Gras, supra*, found that there was no "inherent conflict ... between arbitration and the underlying purpose of [the CFA]," 346 *N.J.Super.* at 52, 786 *A.*2d 886, and we agree. *Gras*, however, did not present the precise issue before the Court in this matter: whether the small amount of damages being pursued in this action involving complicated financial arrangements and multiple out-of-state entities effectively prevents plaintiff from being able to vindicate the public interests protected by the CFA.

---

court should consider whether the availability of attorney's fees (including possible fee enhancement, *Rendine v. Pantzer*, 141 *N.J.* 292, 661 *A.*2d 1202 (1995)) in conjunction with a substantial potential damages award (including potential statutory multipliers) would allow a "substantial number" of consumers to obtain counsel and seek relief.

In our view, New Jersey's public policy favoring arbitration is not determinative of whether a specific class-arbitration waiver is unenforceable. Nothing in the arbitration process requires that claims be brought only by individuals. Moreover, unlike the limited discovery often found in arbitration agreements, class-arbitration waivers do not make arbitration a more streamlined and efficient forum for adjudicating disputes. One could speculate that class-arbitration waivers are viewed as more efficient because of the likelihood that fewer individual consumers would seek redress than those who would be included as part of a class. *Cf. Ting v. AT & T,* 182 *F.Supp.*2d 902, 931 n. 16 (N.D.Cal. 2002) (stating that "the notion that it is to the public's advantage that companies be relieved of legal liability for their wrongdoing so that they can lower their cost of doing business is contrary to a century of consumer protection laws."), *aff'd in part, rev'd in part on other grounds,* 319 *F.*3d 1126 (9th Cir.2003). The purpose of arbitration, however, is not to discourage consumers from seeking vindication of their rights.

To be sure, many commentators have criticized, for various reasons, the class-action mechanism as it is applied in courts. *See* Sternlight and Jensen, *supra,* 67 *Law & Contemp. Prob.* at 102 (noting that "[a]cademics as well as corporate interests have pointed to ethical and efficiency issues and have argued that class actions be limited or reformed, if not eliminated."). Commentators have also suggested that class arbitration may in fact be no different or no more efficient than class actions litigated in court. Jean R. Sternlight, *As Mandatory Arbitration Meets the Class Action, Will the Class Action Survive?,* 42 *Wm. and Mary L.Rev.* 1, 44–53 (2000); Jack Wilson, *No–Class–Action Arbitration Clauses, State Law Unconscionability, and the Federal Arbitration Act: A Case for Federal Judicial Restraint and Congressional Action,* 23 *Quinnipiac L.Rev.* 737, 773–80 (2004). In respect of court actions, the United States Congress and/or our State Legislature may amend class-action procedures should they perceive deficiencies in the current process. And, in the context of class arbitration, contracting parties and the various arbitration forums can

fashion procedural rules specific to class arbitration. Class arbitration is in its infancy and may provide a fertile ground for establishing flexible class-action procedures. *See Discover Bank, supra,* 30 *Cal.Rptr.*3d 76, 113 *P.*3d at 1116 (discussing California's approach to class arbitration). The drafters of arbitration agreements and forum rules, as well as the arbitrators themselves, may allow for the development of innovative class-arbitration procedures that address some of the perceived inadequacies with the current system.[6] That said, in order for a specific procedure to be considered "class arbitration," we presume that the essential elements of modern class actions would be present.

## B.

Our decision today is rooted in the fact-sensitive public interest assessment of the *Rudbart* analysis and is not based on a determination that the arbitral forum, per se, cannot accomplish vindication of a consumer-fraud litigant's rights. In *Gilmer, supra,* the United States Supreme Court stated that arbitration is allowed in actions authorized by federal statutes "[s]o long as the prospective

---

[6] One objection lodged against class actions is that because the stakes are so high, defendants are pressured into settling arguably frivolous claims. The amicus Chamber of Commerce advances that concern, noting the "hydraulic pressure to settle that class certification creates." *See also In re Rhone–Poulenc Rorer Inc.,* 51 *F.*3d 1293, 1299–1300 (7th Cir.) (noting that class certification can force defendants to stake "their companies on the outcome of a single jury trial," whereas numerous individual trials would "reflect a consensus, or at least a pooling of judgment, of many different tribunals.") (Posner, J.), *cert. denied,* 516 *U.S.* 867, 116 *S.Ct.* 184, 133 *L.Ed.*2d 122 (1995); Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near–Total Demise of the Modern Class Action,* 104 *Mich. L.Rev.* 373, 374 (2005) (noting criticism that class certification gives "outsized leverage" to "even the most baseless of class claims."); Wilson, *supra,* 23 *Quinnipiac L.Rev.* at 778 (stating in respect of class arbitration that "companies must fear that a 'renegade arbitrator' will enter an enormous judgment, which almost certainly would be subject to only the traditional, limited judicial review of arbitral awards."). Those concerns could be addressed through class-arbitration rules drafted to establish methods that spread the risks associated with a single decision-maker while still preserving many of the efficiencies of the modern class-action procedure.

litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." 500 *U.S.* at 28, 111 *S.Ct.* at 1653, 114 *L.Ed.*2d at 38 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 *U.S.* 614, 637, 105 *S.Ct.* 3346, 3359, 87 *L.Ed.*2d 444, 462 (1985)). That analysis was used again by the Court in *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 *U.S.* 79, 90, 121 *S.Ct.* 513, 521, 148 *L.Ed.*2d 373, 383 (2000). Defendants argue that those holdings prevent the conclusion that we reach today in respect of Muhammad's arbitration agreement. We reject that argument.

Our analysis does not focus solely on the ability of Muhammad to individually vindicate her statutory rights. Our consideration of "the public interests affected by the contract" under *Rudbart* compels a broader inquiry into how class-action waivers affect the various interests protected under the CFA. Moreover, the analysis undertaken in *Gilmer* and *Randolph* reconciled various remedial federal statutes with the FAA. In *Randolph, supra,* the Court noted as part of its inquiry that it must "ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." 531 *U.S.* at 90, 121 *S.Ct.* at 521, 148 *L.Ed.*2d at 383. That is a uniquely federal question, distinct from an analysis of *state* contract law under *Rudbart.* The California Supreme Court observed similarly in *Discover Bank, supra,* when examining federal cases that have applied *Gilmer* and *Randolph.* 30 *Cal.Rptr.*3d 76, 113 *P.*3d at 1114 n. 6. Noting the difference between the federal "vindication of statutory rights" test and an unconscionability analysis under state law, the California Supreme Court stated that the decisions following the former approach "address whether a federal statute impliedly limits arbitration, [and] are obviously not binding on this court when it decides whether class arbitration waivers are unconscionable under state law principles." *Ibid.; see also Kristian v. Comcast Corp.*, 446 *F.*3d 25, 60 n. 22 (1st Cir.2006) (concluding similarly that state unconscionability analysis, which is "based on the particulars of state contract law, may include considerations not present in the vindication of statutory rights analysis ... which is not

dependent on state law.")); *In re Universal Fund Telephone Billing Practices Litigation,* 300 *F.Supp.*2d 1107, 1136–38 (D.Kan. 2003) (treating procedural unconscionability and availability of "[an] effective forum to vindicate statutory rights" as distinct inquiries).

## C.

Finally, although we find that the class-arbitration waivers in Muhammad's arbitration agreements are unconscionable and unenforceable, we find that the waivers are severable. Once the waivers are removed, the remainder of the arbitration agreement is enforceable. As the Eleventh Circuit has explained,

[i]f all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement. If, however, some or all of its provisions are not enforceable, then the court must determine whether the unenforceable provisions are severable. Severability is decided as a matter of state law. If the offensive terms are severable, then the court must compel arbitration according to the remaining, valid terms of the parties' agreement. The court should deny the motion to compel arbitration only where the invalid terms of the arbitration clause render the entire clause void as a matter of state law.

[*Terminix Int'l Co. LP v. Palmer Ranch Ltd. P'ship,* 432 *F.*3d 1327, 1331 (11th Cir.2005) (citation omitted).]

Similarly, our courts have recognized that "[i]f a contract contains an illegal provision and such provision is severable, courts will enforce the remainder of the contract after excising the illegal portion, so long as the prohibited and valid provisions are severable." *Schuran, Inc. v. Walnut Hill Assocs.,* 256 *N.J.Super.* 228, 233, 606 *A.*2d 885 (Law Div.1991); *see also Naseef v. Cord, Inc.,* 90 *N.J.Super.* 135, 143, 216 *A.*2d 413 (App.Div.) (stating "[i]t is true that if a contract contains an illegal provision, if such provision is severable the courts will enforce the remainder of the contract after excising the illegal portion."), *aff'd,* 48 *N.J.* 317, 225 *A.*2d 343 (1966). The instant contracts embrace that proposition in that the broad class-action waivers in both contracts use the language "[t]o the extent permitted by law." Thus, the contracts reflect an intention that the arbitration agreement would be implemented whether and to whatever extent class-wide arbitration might be

barred. Because we hold that the class-arbitration bar is not enforceable, we need not address plaintiff's additional argument about the impact of the discovery limitations on an individual arbitration claim.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent the majority holds that the arbitration agreements in this case are enforceable, *ante,* 189 *N.J.* at 26, 912 *A.*2d at 103 (2006), I concur. However, to the extent the majority holds that the class-arbitration waivers in plaintiff's arbitration agreements are unconscionable, *ante,* 189 *N.J.* at 22, 912 *A.*2d at 100–01 (2006), I respectfully dissent for the reasons thoughtfully and exhaustively set forth by both the Appellate Division, *Muhammad v. County Bank of Rehoboth Beach, Del.,* 379 *N.J.Super.* 222, 877 *A.*2d 340 (App.Div.2005), and the trial court.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI and WALLACE—5.

*For concurrence in part; dissent in part*—Justice RIVERA–SOTO—1.