930 A.2d 491 (2007)
395 N.J. Super. 655
EXIT A PLUS REALTY, Plaintiff-Appellant,
v.
Edison ZUNIGA, Teresita Zuniga, Defendants-Respondents, and
Sharon Lockett, Defendant.
Coldwell Banker Jablonski Real Estate, Plaintiff-Appellant,
v.
Edison Zuniga, Teresita Zuniga, Defendants-Respondents, and
Sharon Lockett, Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted May 8, 2007.
Decided September 5, 2007.
*493 Leonard P. Kiczek, Bayonne, attorney for appellant Coldwell Banker Jablonski Real Estate.
Roberta L. Tarkan, Jersey City, attorney for respondents Edison Zuniga and Teresita Zuniga.
Greenbaum, Rowe, Smith & Davis, Woodbridge, attorneys for amicus curiae New Jersey Association of Realtors (Barry S. Goodman, of counsel and on the brief; Jane J. Felton, on the brief).
Before Judges AXELRAD, R.B. COLEMAN and GILROY.
The opinion of the court was delivered by
COLEMAN, R.B., J.A.D.
Plaintiff Coldwell Banker Jablonski Real Estate (Coldwell Banker) appeals from a May 25, 2006, order dismissing its complaint for commissions allegedly earned as a result of a sale of real estate from defendants Edison and Teresita Zuniga, to defendant Sharon Lockett the buyer. That sale occurred after the expiration of the exclusive listing agreement between Coldwell Banker and the Zunigas, but within what is referred to as the "extended protection period" under the agreement.
In separate complaints, plaintiff Coldwell Banker and plaintiff Exit A Plus Realty (Exit A Plus), sued the Zunigas and Lockett for real estate commissions which plaintiffs alleged were owed to them upon the closing of title between the Zunigas and Lockett. The matters were consolidated and following a bench trial, the court entered judgment in favor of defendants, reasoning that the Exclusive Right to Sell Agreement (the listing agreement) was unenforceable because it violated N.J.S.A. 45:15-17f in that the listing broker (1) had caused or allowed the sellers to sign the listing agreement with a significant term missing and (2) had failed to leave a copy on the day they signed it. Relying on Winding Brook Realty v. Platzer, 166 N.J.Super. 575, 400 A.2d 145 (Law Div. 1979), aff'd on other grounds, 173 N.J.Super. 472, 414 A.2d 596 (App.Div.), certif. denied, 85 N.J. 119, 425 A.2d 278 (1980), the trial court dismissed plaintiffs' complaints, concluding that one who violates the public policy of the State as reflected in a statute should not be permitted to enforce a commission agreement. In reaching that conclusion, the trial court noted that this court in Winding Brook Realty did not find it necessary or appropriate to reach the legal issue as to whether a violation of N.J.S.A. 45:15-17f would bar an action to recover a commission predicated upon a sale. The trial court, nevertheless, determined that such a violation bars recovery. We now reject such a bright line determination and reverse the May 25, 2006, order.
*494 On April 14, 2005, the Zunigas executed a standard multiple listing agreement granting to Coldwell Banker the sole and exclusive right to sell the Zuniga home in Bayonne from that listing date until the stated expiration date of June 14, 2005. The sellers agreed to pay the broker four and one-half percent of the offering price of $474,900 or of any sale price accepted by the sellers. The listing agreement disclosed that the broker offered a commission split of two percent minus $200 to potential cooperating brokers.
The broker's representative was Christopher Piechocki, who had been a friend of Edison Zuniga for approximately ten years. Piechocki came to the Zuniga home and the parties signed the listing agreement and related documents, but the court found, based on the testimony of Zuniga, that Piechocki did not leave a copy of the listing agreement with the sellers at the time of the execution.[1] In addition, the court found the listing agreement was not complete when it was signed, that the space providing for the so-called extended protection period had been left blank at the time the listing agreement was signed but had been filled in on the copy that Piechocki mailed to the Zunigas under cover of a letter dated April 15, 2005. That portion of the agreement specified the period of time following the expiration of the agreement during which the sellers would pay the broker's commission if the property were sold to a buyer who was introduced to the property during the period of the exclusive listing. The subject provision provided in part as follows:
In the event the property, or any part of it, described in this Agreement is the subject of a written or other agreement by the Buyer and Seller or their designees or is sold conveyed, leased, or in any way transferred within __________ after the expiration of this Agreement to anyone to whom the Seller, Broker or the Broker's salesperson, sub-agent, (participating Broker/Cooperating Broker) or Buyers' Broker/Buyers' Agent or Transaction Broker/Transaction Agent had introduced the property during the terms of this Exclusive Listing, the compensation as indicated above shall be earned by the Broker and payable to the Broker by the Seller, unless the Seller executes a new Exclusive Right to Sell Listing Agreement to take effect upon or anytime after the expiration of this Agreement.
Edison Zuniga testified he received the April 15 letter, with referenced attachments, in the mail, and was surprised to note that Piechocki had entered "90 days" into the blank space on the listing agreement where the space had previously been left blank. He promptly called Piechocki to discuss it and Piechocki told him "[he] shouldn't worry about anything, that wasn't anything." According to Zuniga, at no time did Piechocki explain what the ninety days meant. Nevertheless, because Zuniga had agreed to list the property with plaintiff for "60 days", he put a line through the handwritten "90 days" and above it Zuniga wrote "60".
Thereafter, in about mid-May 2005, Exit A Plus, through its sales agent, Jeet Eucell, produced defendant Lockett as a buyer for the property. The Zunigas and Lockett entered into a contract with a purchase price of $465,000, subject to the property being appraised at that price or above. The appraisal came back at *495 $450,000, and the sellers refused to lower the price. Rather, by letter dated June 15, 2005, one day after the expiration of the exclusive listing agreement with Coldwell Banker, they advised the buyer that if the buyer was not willing to purchase the property at the original contract price of $465,000, then the sellers were declaring the contract null and void. That cancellation of the contract was accepted by the buyer's attorney the same day.
Several days later, the Zunigas agreed to lower their price to $450,000 and Lockett agreed to purchase the property. Title closed on July 19, 2005, and upon learning of the sale, the brokers demanded the four and one-half percent commission provided in the listing agreement which the sellers' refused, prompting Coldwell Banker to file the first of its two complaints in the Special Civil Part.[2]
On appeal, plaintiff contends that it substantially complied with the requirements of N.J.S.A. 45:15-17 and that it therefore was entitled to recover from defendants the commission specified in the exclusive listing agreement. The New Jersey Association of Realtors (NJAR) was permitted to file an amicus curiae brief, and it argues that the listing agreement is enforceable even assuming, after its execution, there may not have been strict compliance with N.J.S.A. 45:15-17f. NJAR also argues, however, that equitable principles of substantial compliance, promissory estoppel and quantum meruit apply and that the Legislature did not provide in N.J.S.A. 45:15-17 (or anywhere else) that not providing a listing agreement to a seller at the exact time the agreement is executed would void the listing agreement, as opposed to exposing the agent to sanctions by the Real Estate Commission. We agree with that latter argument.
The statute at issue in this case, N.J.S.A. 45:15-17, empowers the Real Estate Commission to investigate the actions and regulate the conduct of "any real estate broker, broker-sales person or salesperson, or any person who assumes, advertises or represents himself as being authorized to act as a real estate broker . . . or engages in any activity described in R. 45:15-3 without being licensed so to do." The statute describes various methods of investigation that may be undertaken by the Commission and recognizes its power to subpoena witnesses, compel attendance and require the production of any material which is relevant to the Commission's investigation. This statutory provision also empowers the Commission to place on probation, suspend or revoke licenses or the right of licensure when any person is no longer the holder of the license at the time of the hearing and impose penalties or take other action where the licensee or any person, in performing or attempting to perform any of the acts mentioned in the statute is deemed to be guilty of acting or of failing to act as described therein. Among the actions or inactions for which a person may be sanctioned by the Commission are those set forth by subparagraph f:
Failure to provide his client with a fully executed copy of any sale or exclusive *496 sales or rental listing contract at the time of execution thereof, or failure to specify therein a definite terminal date which terminal date shall be subject to any qualifying terms or conditions[.]
Although Piechocki, the agent of the listing broker, testified that he had left a completed copy of the listing agreement with Zuniga, Zuniga disputed that and the court determined that Zuniga was more credible, in part because Piechocki's letter, dated April 15, 2005, transmitted a copy of the documents, tending to support the conclusion that he had not left a copy of the listing agreement at the time they were signed on the preceding evening. We are bound by the trial court's factual determination. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). Yet, it is plain from a review of N.J.S.A. 45:15-17 that it is a broad ranging regulatory provision empowering and furnishing guidance to the Commission in the discharge of its responsibility for the supervision and regulation of real estate brokers and salespersons. However, the statute does not specify what remedy or discipline shall be provided for violation of any particular subpart of the statute, and it does not declare that the violation of any particular provision by a real estate broker shall render any action taken or any agreement entered into by such broker null and void.
As we have previously recognized, "[c]lassically in respect of a listing agreement, absent specific provisions to the contrary, the seller is liable for a commission if the property is sold to any non-excepted buyer during the listing term or is sold after the listing term to any buyer generated by the contracting realtor before the listing term expired." Island Realty v. Bibbo, 329 N.J.Super. 528, 533-34, 748 A.2d 620 (App.Div.), certif. denied, sub nom. Island Realty v. Decker-Bibbo, 165 N.J. 487, 758 A.2d 646 (2000). "In general, the seller is liable for the commission where, during the listing term, the realtor was the `efficient procuring cause' of an actual sale." Id. at 534, 758 A.2d 646 (quoting Prudential Stewart Realty v. Sonnenfeldt, 285 N.J.Super. 106, 112, 666 A.2d 589 (App.Div.1995)). With regard to the ordinary prospective purchaser, "it [is] a matter of common knowledge that [he] knows when he consults a broker that if he buys a property through the efforts of the broker, customarily the broker will earn a commission on the sale to be paid by the owner-seller out of the purchase price." Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 558, 236 A.2d 843 (1967).
Plainly, there exists in every contract an implied covenant of good faith performance and fair dealing. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420-21, 690 A.2d 575 (1997); Island Realty, supra, 329 N.J.Super. at 533, 748 A.2d 620; Prudential Stewart Realty, supra, 285 N.J.Super. at 109, 666 A.2d 589. Also, the relationship between a broker and its principal is one affected by considerations of public policy. Ellsworth Dobbs Inc., supra, 50 N.J. at 553, 236 A.2d 843. Thus, "[t]he broker . . . is looked upon as a fiduciary and is required to exercise fidelity, good faith and primary devotion to the interests of his principal." Ibid. And as the Court has noted:
public policy requires the courts to read into every brokerage agreement or contract of sale a requirement that barring default by the seller, commissions shall not be deemed earned against him unless the contract of sale is performed. By the same token, whenever the substantial inequality of bargaining power, position or advantage . . . appears, a provision to the contrary in an agreement prepared or presented or negotiated or procured by the broker shall be *497 deemed inconsistent with public policy and unenforceable.
[Id. at 555-56, 236 A.2d 843.]
Thus, the defendants contend that the broker's failure to comply strictly with the provisions of N.J.S.A. 45:15-17f renders the so-called extended protection period quoted earlier unenforceable. We disagree.
Contrary to the determination of the trial court reached in reliance upon Winding Brook Realty, we are of the view that a violation of any of the enumerated provisions of N.J.S.A. 45:15-17 would render the agreement voidable, but not automatically void. Indeed, as pointed out in the amicus curiae brief submitted by NJAR, if the Legislature had wanted to invalidate agreements entered in contravention of N.J.S.A. 45:15-17, it could have done so explicitly, as it has done in numerous other instances. See, e.g., N.J.S.A. 2A:18-61.4 (lease provision that provides for other than good cause termination "shall be deemed against public policy and unenforceable"); N.J.S.A. 2A:18-61.36 (agreement by which a tenant waives certain statutory rights deemed "against public policy and unenforceable"); N.J.S.A. 2A:42-96 (lease provision that waives any statutory tenant protection "shall be deemed against public policy and void"); N.J.S.A. 56:4-1.1 (contract that restrains a purchaser of a commodity from reselling the commodity at less than a stipulated price "shall not be enforceable or actionable at law").
It is instructive to consider the Court's approach to determining enforceability of contracts alleged to be contracts of adhesion, that is, contracts "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity of the `adhering' party to negotiate except perhaps on a few particulars." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). The Court has observed that "[t]he determination that a contract is one of adhesion . . . `is the beginning, not the end, of the inquiry' into whether a contract, or any specific term therein should be deemed unenforceable based on policy considerations." Muhammad v. County Bank of Rehoboth Beach, 189 N.J. 1, 15, 912 A.2d 88 (2006) (quoting Rudbart, supra, 127 N.J. at 354, 605 A.2d 681). "A sharpened inquiry concerning unconscionability is necessary when a contract of adhesion is involved." Ibid. Relevant factors deserving of attention when a court is asked to declare a contract of adhesion unenforceable were articulated in Rudbart:
[I]n determining whether to enforce the terms of a contract of adhesion, [we] look[] not only to the take-it-or-leave-it nature or the standardized form of the document but also to [(1)] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [(3)] the degree of economic compulsion motivating the "adhering" party, and [(4)] the public interests affected by the contract. [Rudbart, supra, 127 N.J. at 356, 605 A.2d 681.]
See also Muhammad, supra, 189 N.J. at 15-16, 912 A.2d 88 (considering whether a provision waiving class arbitration contained in an arbitration agreement that is part of a consumer contract of adhesion is unconscionable); Delta Funding Corp. v. Harris, 189 N.J. 28, 40, 912 A.2d 104 (2006) (reviewing arbitration agreement found in a consumer loan contract in a matter certified and submitted by the United States Court of Appeals for the Third Circuit). The point is that the decision whether a particular agreement or provision therein is unenforceable is fact-sensitive and must be determined on a *498 case-by-case basis. Martindale v. Sandvik, Inc., 173 N.J. 76, 90, 800 A.2d 872 (2002).
In this instance, the Legislature granted substantial power and authority to the Commissioner to regulate the conduct of real estate brokers and to sanction improper conduct by imposition of fines, probation, suspension and even revocation of licenses. On the other hand, it is silent with regard to any rights as between the broker, the seller and the buyer. We note, however, that, apart from any contractual rights that may exist, the rights of the consumers are amply protected by reference to the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to 56:8-20, and those rights are relevant to the determination of the enforceability of terms in a standard real estate listing agreement.
Like N.J.S.A. 45:15-17, which vests power in the Real Estate Commission, the CFA as originally enacted vested only the Attorney General with enforcement power. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 691 A.2d 350 (1997); Cox v. Sears Roebuck & Co., 138 N.J. 2, 14-15, 647 A.2d 454 (1994). In 1971, the CFA was amended to authorize private actions by injured parties, and in 1975, the Legislature further amended the Act to include unlawful practices in the sale or advertisement of real estate. Cox, supra, 138 N.J. at 15, 647 A.2d 454. Now, pursuant to the CFA, "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of any method, act or practice declared unlawful under this act . . . may bring an action[.]" N.J.S.A. 56:8-19. An offense arises under the Act from an affirmative act, an omission, or a violation of an administrative regulation; and in a private action brought under the CFA, the court shall, in addition to any other appropriate legal or equitable relief, award three-fold the damages sustained by any person in interest. Ibid.
Significantly, in this case, the Zunigas did not suffer any prejudice by Piechocki's failure to leave a copy of the contract with them on the date it was signed. It was mailed to them the next day. Nor were they prejudiced by the insertion of the ninety day provision in the agreement. Indeed, Edison Zuniga telephoned Piechocki upon receipt of the contract because he said he was surprised that "90 days" had been inserted into the blank space of the extended protection provision. Zuniga could have objected to the insert and could have refused to go forward with the listing. Instead, he changed the "90 days" to "60 days," which was acceptable to Piechocki.
We recognize that the court found that Zuniga testified credibly, that he understood that provision to relate to the term of the underlying agreement rather than to the period after the expiration of the agreement, but that understanding is at odds with the writing itself. It is also at odds with the view that a broker is entitled to a commission if his introduction of the buyer to the property is the efficient cause in bringing about the sale, and it is not objectively reasonable.
Zuniga's cancellation of the contract of sale with Lockett one day after the expiration date of the exclusive listing agreement and the subsequent acceptance of the offer of purchase at the appraised value of the property, raise significant questions of good faith and fair dealing. The trial judge accepted Edison Zuniga's explanation, but the court, rather than evaluating all of the circumstances, ruled on the basis of the perceived unenforceability of the agreement under the Law Division's interpretation of Winding Brook Realty, which we now disapprove.
Plaintiffs and the NJAR acknowledge that the Commissioner may discipline a *499 real estate broker who allows or causes a seller to sign an incomplete listing agreement and who fails to leave a copy of a completed agreement with such seller, but they argue, with justification we think, that such derelictions were technical violations that resulted in no prejudice to defendants. They emphasize that the Zunigas accepted the benefit of the brokers' services and therefore should be liable for the commission. See, e.g., Ellsworth Dobbs, Inc., supra, 50 N.J. at 552, 236 A.2d 843 (noting that "[w]hat must be regarded as the fundamental intendment of the parties, owner and broker, i.e., that the owner will sell and the buyer will pay, and the broker will thus earn his commission out of the proceeds, cannot be ignored in this connection"). Where the sellers had in their possession a fully completed copy of the agreement within days of its having been signed and where they focused on and rejected an allegedly unauthorized entry but made a different entry in the challenged space, they should not be heard to disavow a fair and objective understanding of the words contained in the agreement. Nor should they be permitted to enjoy the benefit of the brokers' efforts but avoid the fair and just obligation to pay the commission promised for the benefit conferred.
We find it unnecessary to undertake an extensive discussion of the equitable doctrines of substantial compliance or estoppel. We note only that, consistent with the underlying purpose of the statute, "[c]ourts invoke the doctrine of substantial compliance `to avoid technical defeats of valid claims.'" Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 239, 708 A.2d 401 (1998) (quoting Zamel v. Port of New York Authority, 56 N.J. 1, 6, 264 A.2d 201 (1970)); Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 151, 836 A.2d 779 (2003). "It is a doctrine based on justice and fairness, designed `to avoid technical rejection of legitimate claims." Ferreira, supra, at 151, 836 A.2d 779 (quoting Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 352, 771 A.2d 1141 (2001)).
Reversed and remanded for further proceedings.
NOTES
[1] Piechocki testified he left a completed copy of the listing agreement on the table when he left. What he did not give Zuniga at the time was a document entitled "Property Description Form," which he filled out back at the office. According to Piechocki, that form provides details about the house but does not deal with dates, numbers and commissions.
[2] At the time of trial, counsel for plaintiff explained that after the first complaint had been filed, the Clerk's Office notified counsel of a shortage in the filing fee which prompted the filing of the second, identical complaint. Those two actions were consolidated with the action that had been brought by Exit A Plus. In the appeal, trial counsel for Coldwell Banker filed an Amended Notice of Appeal on behalf of both Coldwell Banker and Exit A Plus. No separate appellate filings have been made by or on behalf of Exit A Plus. Accordingly, we refer to the brokers hereafter in the singular except where context requires separate designation.