**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3789
_____

ARTHUR CHASSEN; DEBORAH MEREDITH;
JOEL OSTER; DENNIS SCRIMER; GLEN J. DALAKIAN;
JACK HOFFMAN; DEBORAH HOFFMAN; KATHLEEN
COOPER;  RICHARD MURPHY, individually and on behalf
of others similarly situated; AMI FELLER,
                                          Appellants
v.

FIDELITY NATIONAL FINANCIAL, INC., a Delaware
corporation; FIDELITY NATIONAL TITLE INSURANCE
COMPANY, a California corporation;
CHICAGO TITLE INSURANCE COMPANY, a Missouri
corporation; THE FIRST AMERICAN CORPORATION, a
California corporation; FIRST AMERICAN TITLE
INSURANCE COMPANY, a California corporation;
LANDAMERICA FINANCIAL GROUP, INC., a Virginia
corporation; TRANSNATION TITLE INSURANCE
COMPANY, a Nebraska corporation; LAWYERS TITLE
INSURANCE CORPORATION, a Nebraska corporation;
STEWART INFORMATION SERVICES CORPORATION,
a Delaware corporation; STEWART TITLE GUARANTY
COMPANY, a Texas corporation; OLD REPUBLIC

INTERNATIONAL CORPORATION, a Delaware corporation; OLD REPUBLIC TITLE INSURANCE GROUP, INC., a Delaware corporation; OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, a Minnesota corporation; WEICHERT TITLE AGENCY

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 3-09-cv-00291

District Judge: The Honorable Peter G. Sheridan

Argued July 13, 2016

Before: SMITH, ROTH, and RENDELL, *Circuit Judges*

(Filed: September 8, 2016)

Esther E. Berezofsky, Esq.
Williams Cuker Berezofsky
210 Lake Drive East
Woodland Falls Corporate Park
Suite 101
Cherry Hill, NJ  08002

Mark R. Cuker, Esq.
Michael J. Quirk, Esq.  **[ARGUED]**
Williams Cuker Berezofsky
1515 Market Street
Suite 1300

Philadelphia, PA 19102


Andrew R. Wolf, Esq.
Henry P. Wolfe, Esq.
The Wolf Law Firm
1520 U.S. Highway 130
Suite 101
North Brunswick, NJ  08902
        *Counsel for Appellant*




Derrick R. Freijomil, Esq.
Michael R. O'Donnell, Esq.  **[ARGUED]**
Riker Danzig Scherer Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ  07962


Grant J. Ankrom, Esq.
Jason E. Maschmann, Esq.
Charles A. Newman, Esq.
Denton US
One Metropolitan Square
211 North Broadway, Suite 3000
St. Louis, MO  63102

Frederick W. Alworth, Esq.
Joshua R. Elias, Esq.

Gibbons
One Gateway Center
Newark, NJ  07102

Kevin M. Fee, Jr., Esq.
Gerard D. Kelly, Esq.
Sidley Austin
One South Dearborn Street
Chicago, IL  60201

Steven P. Benenson, Esq.
Porzio Bromberg & Newman
100 Southgate Parkway
Morristown, NJ  07960

*Counsel for Appellees*

_____

OPINION
_____

SMITH, *Circuit Judge.*

"A waived claim or defense is one that a party has knowingly and intelligently relinquished." *Wood v. Milyard*, 132 S. Ct. 1826, 1832 n.4 (2012). How, then, can a party waive a right "in a situation in which no right existed[?]" *Ackerberg v. Johnson*, 892 F.2d 1328, 1333 (8th Cir. 1989).

4

The answer is: it cannot. Every circuit to have answered this question has held that "a litigant [need not] engage in futile gestures merely to avoid a claim of waiver." *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986), *abrogated on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271 (1988). We too adopt this position and therefore hold that futility can excuse the delayed invocation of the right to compel arbitration. Because we also conclude that any attempt to compel bipolar – that is, individual – arbitration in this case prior to the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), would have been futile, we will remand with instructions that the District Court compel bipolar arbitration of all Plaintiffs' arbitrable claims in accordance with its May 14, 2015, order and this opinion.

I.

Plaintiffs represent a putative class of New Jersey real estate purchasers and refinancers who were overcharged between $70 and $350 in fees stemming from the recording of their deeds and mortgage instruments. Plaintiffs allege that the settlement agents – title agents and attorneys who were, in turn, agents of the Defendants – intentionally charged Plaintiffs more than the county clerk charged for recording these documents and pocketed the difference. Plaintiffs further allege that the class claims add up to over $50 million, exclusive of treble damages and interest.

5

On January 22, 2009, Plaintiffs filed a complaint in the U.S. District Court for the District of New Jersey alleging both breach of contract and violation of New Jersey law. In response, Defendants sought to dismiss a number of these claims and raised several affirmative defenses. They did not, however, seek to compel arbitration based on the arbitration clauses present in their contracts with Plaintiffs.[1] While no explanation for this inaction was given, we conclude *infra* that an attempt to compel bipolar arbitration would have been futile under prevailing New Jersey law. Because arbitration was not sought, the case was litigated for two and a half years with the focus primarily on class certification. In that time, both sides conducted broad discovery and contested several substantive motions on their merits. Plaintiffs have also extensively documented their efforts in this case and note that they served over 130 non-party subpoenas and spent over $50,000 on experts before Defendants sought bipolar arbitration.

However, on April 27, 2011, the Supreme Court in *Concepcion* held that the Federal Arbitration Act (FAA) preempted state laws that had previously prohibited a party from compelling bipolar arbitration in certain situations even when it was specifically agreed to by contract. 563 U.S. at

---

[1] There are two arbitration clauses at issue here; some putative class members have claims under the 1987 Owner's Policy while others have claims under the 1992 Loan Policy. For purposes of this analysis, the minor differences between the two are immaterial.

352.[2] Sensing an opportunity to ward off this potential class action, Defendants sent a letter to Plaintiffs on June 8, 2011, demanding enforcement of the arbitration agreements in light of this change in the law.[3] Plaintiffs rejected this arbitration demand and noted that the question of arbitration "might have been an interesting issue had you thought of it two and a half years ago when the case was filed . . . ." JA 816. Defendants then filed a motion in the District Court to compel bipolar arbitration on August 1, 2011. The District Court concluded

---

[2] It cannot be disputed that *Concepcion* marked a change in our jurisprudence. *See Litman v. Cellco P'ship*, 655 F.3d 225, 230 (3d Cir. 2011) ("The specific question before us remains whether the FAA preempts the New Jersey Supreme Court's ruling in *Muhammad*. As noted above, we had previously held that, pursuant to *Homa*, it did not. We now examine that decision anew and hold that *Homa* has been abrogated by *Concepcion* and that *Muhammad* is preempted by the FAA.").

[3] The dissent characterizes Defendants' "about-face" as a "litigation tactic [intended] to derail the court proceedings." Such a characterization would seem to apply regardless of when Defendants moved for arbitration, as arbitration *by definition* derails court proceedings. In addition, deciding whether to invoke an arbitration clause is certainly a litigation "tactic," but tactical decision making alone does not counsel against enforcement of a valid arbitration agreement. Indeed, this general disapproval of arbitration clauses has been roundly rejected by the Supreme Court. *Concepcion*, 563 U.S. at 339 (explaining that the FAA reflects a "liberal federal policy favoring arbitration.").

7

that any attempt to compel bipolar arbitration prior to *Concepcion* would have been futile. Accordingly, the District Court granted the motion, stayed the case, and ordered bipolar arbitration.

This decision, however, led to a barrage of motions for reconsideration that, as the District Court observed, "has come to resemble a ping pong match between the parties." JA 42. Ultimately, the District Court conducted an evidentiary hearing and found that all but two Plaintiffs had agreed to bipolar arbitration. Accordingly, over Plaintiffs' strong protest, it again compelled bipolar arbitration of the remaining claims.

Three issues relating to this ruling were certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b):

> (a) Whether the [District] Court's decision to allow Defendants to assert the affirmative defense of arbitration due to a change in law even though a substantial period of time elapsed between [D]efendant[s'] answer and filing of the motion to assert the defense was in error; (b) Whether Plaintiffs' claims against Defendants alleging a violation of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 et seq., are barred; and (c) any other issues arising out of the District Court's decision concerning the arbitration of the claims.

8

JA 195-96 (internal citations omitted). Because we conclude that the District Court did not err in compelling bipolar arbitration, we need not address any other issues on appeal.[4]

## II.

We first consider whether, as an abstract matter, the futility of raising bipolar arbitration as a defense should excuse the delay in doing so. Generally, "[a] written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Federal Arbitration Act, 9 U.S.C. § 2. The Supreme Court has stated that this provision reflects a "'liberal federal policy favoring arbitration.'" *Concepcion*, 563 U.S. at 339 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Thus "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25; *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989) ("There is no federal policy favoring arbitration under a certain set of

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) and this Court has jurisdiction pursuant to 28 U.S.C. § 1292(b).

9

procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."). Given this strong preference to enforce arbitration agreements, we have concluded that a party waives the right to arbitrate "only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1068-69 (3d Cir. 1995) (internal quotation marks and citation omitted).

For example, in *Ehleiter v. Grapetree Shores, Inc.*, we held that a defendant seeking to compel arbitration may waive the right to do so when the plaintiff demonstrates unfair prejudice arising from the defendant's delay in raising arbitration as an affirmative defense. 482 F.3d 207, 223 (3d Cir. 2007). To guide this prejudice inquiry, in *Hoxworth v. Blinder, Robinson & Co.* we identified six nonexclusive factors that courts should consider when determining if the defense of arbitration has been waived: (1) the timeliness or lack thereof of the motion to arbitrate; (2) the extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which the party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery. 980 F.2d 912, 926-27 (3d Cir. 1992).

None of these cases, however, dealt with a situation in which the prejudicial delay occurred solely because an attempt to raise the defense of arbitration earlier would have been futile. Accordingly, we believe that our analysis in a futility case cannot rely solely on *Hoxworth* because there, waiver was premised on the fact that the right in question indisputably existed and could have been raised earlier. *Wood*, 132 S. Ct. at 1832 (defining waiver as the known relinquishment of a claim or defense). It makes no sense to consider, for example, whether a party "assent[ed] to the district court's pretrial orders," *Hoxworth*, 980 F.2d at 927, when, at the time the orders were issued, the party had no grounds on which it could plausibly contest them. In other words, *Hoxworth* was simply not a futility case. Thus, its list of factors for determining prejudice is ill suited for our analysis here.

Accordingly, we must look beyond *Hoxworth* to determine whether and when futility can excuse the delayed invocation of an arbitration clause as an affirmative defense. In so doing, we identify three primary reasons why we believe that adoption of the futility exception in this context is appropriate.

First, we believe that in the arbitration context, the logic of our waiver analysis – in addition to its specific factors – is undercut to the extent that the delay we are considering was the result of futility. This suggests to us that the standard waiver analysis should not apply in the futility context. *Cf. Moses H. Cone*, 460 U.S. at 24-25 ("[A]ny

11

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability.").  As we noted in *Hoxworth*, "'where a party fails to demand arbitration during pretrial proceedings, and, in the meantime, engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its position has been compromised, i.e., prejudiced.'"  980 F.2d at 926 (quoting *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1161 (5th Cir. 1986)).  In other words, one of the primary justifications for waiver is that the party attempting to raise it as a belated defense acted inconsistently with his earlier known right to do so.  However, if an earlier attempt to assert the defense of arbitration would have been futile, this failure to take a futile action is not inconsistent with that defense.  *See Fisher*, 791 F.2d at 697 ("[T]he Fishers have failed to demonstrate that Becker acted inconsistently with a known existing right to compel arbitration.").  Thus, applicability of the standard waiver analysis seems to miss the key fact that while there may be some prejudice resulting from the delay in raising a particular defense, that prejudice is attributable to a change in the applicable law, not to any negligent action on the part of either party.

Second, we have recognized futility as an exception to both ripeness and administrative exhaustion.  *See Sammon v. N. J. Bd. of Med. Examiners*, 66 F.3d 639, 641 (3d Cir. 1995) (engaging in a "futile gesture to establish ripeness" would be

12

unnecessary); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990) ("Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile."); *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002) ("A plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so."). We see no reason why this logic would not extend to the case at hand. Why would we require a party to make a "futile gesture" to prevent waiver when we do not require such gestures in other scenarios?

Finally, as Plaintiffs' admitted at oral argument, all four circuits to have considered this issue have undertaken similar analyses and come to the same conclusion. *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 697 (9th Cir. 1986) ("Until the Supreme Court's decision in *Byrd*, the arbitration agreement in this case was unenforceable. Therefore, the Fishers have failed to demonstrate that Becker acted inconsistently with a known existing right to compel arbitration."); *Miller*, 791 F.2d at 854 ("This circuit does not require a litigant to engage in futile gestures merely to avoid a claim of waiver. Thus, appellees' failure to request arbitration prior to the *Byrd* decision is irrelevant to the issue of waiver."); *Peterson v. Shearson/Am. Exp., Inc.*, 849 F.2d 464, 466 (10th Cir. 1988) ("There was no requirement that Shearson make a futile attempt to obtain arbitration on the federal claim given the state of the law; indeed, it would be difficult to argue that such an attempt had a basis in existing law."); *Ackerberg*, 892 F.2d at 1333 ("[W]e cannot find

13

waiver, the voluntary relinquishment of a known right, in a situation in which no right existed. . . . To find that the [] defendants waived a right they did not have . . . is not only illogical, but also would encourage litigants, in order to avoid a finding of waiver, to file motions they knew to be futile."). We therefore hold that futility can excuse the delayed invocation of the defense of arbitration.

## III.

We next look at the futility exception in the context of this case. To do this, we first consider the existing bipolar and class arbitration case law and conclude that courts have typically treated each form of arbitration as substantively distinct. We therefore conclude that each can be independently waived, thereby requiring that each receive a separate futility analysis. We next ask what it means for the assertion of a right to have been futile, concluding that the appropriate test is whether assertion of that right was almost certain to fail. Finally, we apply this framework and hold that here, a motion to compel bipolar arbitration prior to *Concepcion* was almost certain to fail.

## A.

Plaintiffs contend that it would not have been futile for Defendants to have moved to enforce the arbitration clauses prior to *Concepcion*. Defendants, however, assert that this is

14

not the proper question. Instead, they suggest that the real question is whether they could have compelled *bipolar* arbitration prior to *Concepcion*.[5] We agree with Defendants that the latter question is the proper inquiry, largely because profound differences distinguish class and bipolar arbitration. *Cf.* David S. Clancy, Matthew M.K. Stein, *An Uninvited Guest: Class Arbitration and the Federal Arbitration Act's Legislative History*, 63 Bus. Law. 55, 62 (2007) ("Class arbitration is very different from the arbitration contemplated by Congress when Congress passed the FAA, and it is different in ways that plainly matter: its characteristics are the opposite of those that impressed Congress about arbitration."). In *Opalinski v. Robert Half International, Inc.*, we undertook a thorough review of Supreme Court and Third Circuit cases dealing with class and bipolar arbitration. 761 F.3d 326 (3d Cir. 2014). In doing so, we concluded that bipolar and class arbitration are distinct at a fundamental, substantive level. They are thus not merely different adjudicative procedures that are easily interchanged:

> [W]e read the Supreme Court as characterizing the permissibility of classwide arbitration not solely as a question of procedure or contract interpretation but as a substantive gateway

---

[5] Indeed, Plaintiffs acknowledge that "Defendants have not sought arbitration other than on an individual basis" and at one point in this litigation argued that the motion to compel such arbitration should be denied *because* it would not allow for class arbitration. ECF No. 221 at * 40.

15

> dispute qualitatively separate from deciding an individual quarrel. Traditional individual arbitration and class arbitration are so distinct that a choice between the two goes, we believe, to the very type of controversy to be resolved.

*Id.* at 334. Indeed, we further noted that "[t]he [Supreme] Court's line of post-*Bazzle* opinions . . . indicates that, because of the fundamental differences between classwide and bilateral arbitration, and the consequences of proceeding with one rather than the other, the availability of classwide arbitrability is a substantive gateway question . . . ." *Id.* at 335 (discussing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 459 (2003)). Accordingly, we held that – absent clear and unmistakable evidence of agreement to the contrary – the court, not the arbitrator, must decide whether a contract permits either bipolar or class arbitration. *Id.* at 330, 335.

Indeed, the Supreme Court in *Concepcion* also highlighted three reasons why class arbitration is fundamentally different from bipolar arbitration. "First, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." 563 U.S. at 348. "Second, class arbitration requires procedural formality. The AAA's rules governing class arbitrations mimic the Federal Rules of Civil Procedure for class litigation." *Id.* at 349. "Third, class arbitration greatly increases risks to defendants." *Id.* at 350. Indeed, as *Concepcion* concluded, "[a]rbitration is poorly suited to the higher stakes of class

16

litigation." *Id.* These differences make it clear why parties, to put it bluntly, care so much about whether the agreement to arbitrate permits class arbitration. They also make clear why having the right to compel *class* arbitration is not the same as having the right to compel *bipolar* arbitration.[6] We thus part ways with our dissenting colleague who believes that the "dispositive question here" is whether "it would have been futile in 2009 for [Defendants] to move to enforce the arbitration clauses." By so broadening the dispositive inquiry in this case, it is no wonder she concludes that the futility exception does not apply. Had Defendants sought to enforce the arbitration clauses in 2009, they would have been, as we explain below, forced into class arbitration with near certainty.[7] Even the dissent begrudgingly acknowledges that

---

[6] We recognize that both *Concepcion* and *Opalinski* were decided after this case was brought and thus were not available to Defendants when they had to decide whether to move for bipolar arbitration. That said, we believe that these cases fairly summarize the rather uncontroversial position that class arbitration differs greatly from bipolar arbitration. *See Bazzle*, 539 U.S. at 459 (recognizing that parties who have agreed to bipolar arbitration cannot be forced into class arbitration because the two procedures are substantively distinct); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) ("[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement."). This was well understood in 2009 when the complaint was filed.

[7] As discussed *infra*, the New Jersey Supreme Court made it clear that "it [is] unconscionable for defendants to deprive

17

they "might not have succeeded in getting what they wanted: individual arbitration." How, then, can we say that Defendants waived the right to *individual* arbitration by failing to seek to enforce an arbitration clause which almost certainly would have resulted in *class* arbitration? We believe that the right to individual arbitration is a distinct right separate from the right to class arbitration. We therefore hold that – whether or not class arbitration was permissible – a court must also determine whether it would have been futile to move for bipolar arbitration under the prevailing law. We turn, then, to that question.

B.

To determine whether Defendants' motion to compel bipolar arbitration would have been futile, we must first define futility as understood in this context. Other courts to address this issue have concluded that futility does not mean something is *absolutely* impossible; nor does it mean something is merely improbable. *See generally Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1279 (11th Cir. 2012) ("The more lenient unlikely-to-succeed standard . . . would only encourage litigants to delay moving to compel arbitration until they could ascertain how the case was going in federal district court." (internal citations and quotation marks omitted)). Instead, when asking whether arbitration would

_____

[plaintiff] of the mechanism of a class-wide action, whether in arbitration or in court litigation." *Muhammad*, 189 N.J. at 22.

18

have been futile, courts ask whether "it was *almost certain* . . . that a motion to compel arbitration would have been denied." *Id.* (emphasis added); *see also Miller*, 791 F.2d at 854 ("[A]ny motion to compel arbitration would almost certainly have been futile."); *Peterson*, 849 F.2d at 466 ("Because Shearson almost certainly could not have obtained an order for arbitration of the Rule 10b-5 claim prior to *McMahon*, it did not waive its right to arbitrate the claim.").[8]

We agree, which requires us to ask whether a motion to compel bipolar arbitration filed by Defendants prior to *Concepcion* was almost certain to fail. We hold that it was. Then-existing New Jersey law prohibited courts from compelling bipolar arbitration in a certain subset of adhesive consumer contracts. *Muhammad v. Cty. Band of Rehoboth Beach, DE*, 189 N.J. 1 (2006). Because we conclude that the contracts here fall within the subset of contracts for which compelled bipolar arbitration would have been unconscionable under *Muhammad*, we hold that any attempt

---

[8] We see no conflict between the "almost certain to fail" standard and the Eighth Circuit's position that waiver is appropriate if "it should have been clear . . . that the arbitration agreement was at least arguably enforceable." *Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 967 (8th Cir. 2009). If an arbitration clause is *not* at least arguably enforceable, it is almost certain to fail. These are, if not essentially the same standard, logically parallel.

19

to seek bipolar arbitration in this case prior to *Concepcion* was almost certain to fail.

In *Muhammad*, the New Jersey Supreme Court held that "it was unconscionable for defendants to deprive Muhammad of the mechanism of a class-wide action, whether in arbitration or in court litigation." 189 N.J. at 22. This was because "[t]he public interest at stake in [the plaintiff's] ability and the ability of her fellow consumers effectively to pursue their statutory rights under this State's consumer protection laws overrides the defendants' right to seek enforcement of the class-arbitration bar in their agreement." *Id.* Specifically, the court considered "the small amount of damages being pursued in this action involving complicated financial arrangements and multiple out-of-state entities." *Id.* It then went on to note that the small value of each claim – at most $600 – would make it difficult to pursue individually, even if recovery of attorney's fees were permitted. *Id.* at 21 ("One may be hard-pressed to find an attorney willing to work on a consumer-fraud complaint involving complex arrangements . . . when the recovery is so small."). Accordingly, the court concluded – after performing a fact intensive inquiry – that in a certain subset of adhesive contracts, a consumer cannot be compelled to submit to bipolar arbitration. This was primarily because the court concluded that individual plaintiffs were frequently discouraged from asserting meritorious claims by the relatively high costs inherent in doing so. Thus, as a policy matter, the court concluded that consumers in such situations

20

could not be forbidden from pursuing their claims in a class setting. *Id.*

Three years later in *Homa v. American Express Co.*, we also confirmed that this New Jersey policy was not preempted by the FAA. 558 F.3d 225 (3d Cir. 2009). In *Homa*, a putative class of consumers alleged that American Express misrepresented the terms of the rewards program for one of its credit cards. 558 F.3d at 227. Like *Muhammad*, the claims at issue in *Homa* were small claims that were not generally worth litigating on an individual basis. *Id.* The District Court in *Homa*, however, held that despite *Muhammad*, American Express could compel bipolar arbitration by enforcing the class arbitration waiver provision in its contracts. *Id.* at 230-231. We read *Muhammad* differently and reversed. First, we noted that the District Court placed too much emphasis on language in *Muhammad* explaining that class-arbitration waivers are not *per se* unenforceable. *Id.* at 230. We concluded that this focus on the lack of a *per se* rule inappropriately minimized the broader applicability of *Muhammad* and its conclusion that certain contracts barring class arbitration violated New Jersey's public policy against exculpatory clauses. *Id.* Second, we compared the facts of *Homa* to those in *Muhammad* and concluded that

> the contract at issue [in *Homa*] bears the hallmarks of a contract of adhesion—it was presented on a take-it-or-leave-it basis, . . . in a standardized printed form, without opportunity

21

for the adhering party to negotiate except perhaps on a few particulars and, as Appellant's underlying claim implicates less than five percent of a cardholder's overall credit card balance, predictably involves a small amount of damages . . . . [Thus,] the District Court should have denied the 12(b)(6) motion and concluded that, in light of *Muhammad*, at this stage the class-arbitration waiver at issue violates New Jersey's fundamental public policy.

*Id.* at 231. Thus, "we h[e]ld that, if the claims at issue are of such a low value as effectively to preclude relief if decided individually, then, under *Muhammad*, . . . the class-arbitration waiver is unconscionable."[9] Here, however, because we

---

[9] In a concurring opinion, Judge Weis also discussed some of the specific factors that New Jersey courts seemed to focus on when determining if a contract is unconscionable. This list, too, makes it clear that one of the key factors is the relatively small value of the individual claims: "[m]atters bearing on the Court's appraisal included the lawsuit's complexity, the amount of damages involved, and the availability of attorneys' fees and statutory multipliers. The size of potential damages was considered to be an important consideration and was used to limit the holding to 'low-value' cases." *Homa*, 558 F.3d at 233. He did, however, express some doubt about our ability to determine with certainty how the New Jersey Supreme Court would rule if confronted with this case, and thus explained that the District Court should perform a more in depth application of *Muhammad* on remand. *Id.* at 233-34.

22

know the value of the individual claims, we need not require the District Court to conduct further inquiry into this issue on remand.

Applying *Homa* and *Muhammad*, we must undertake a fact specific inquiry into whether the contracts in this case have the same characteristics as those discussed above. *See Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 605 A.2d 681, 687 (N.J. 1992) ("[I]n determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract."). If so, we can confidently conclude that any attempt by the Defendants to compel bipolar arbitration – and "deprive [Plaintiffs] of the mechanism of a class-wide action, whether in arbitration or in court litigation," *Muhammad*, 189 N.J. at 22 – was almost certain to fail.

In doing so, we conclude that the contracts here contain the same characteristics as those in *Muhammad* and *Homa*. Therefore, a New Jersey court confronted with this case in 2009 would almost certainly have found *Muhammad* controlling and would have denied Defendants' motion to compel bipolar arbitration. Specifically, we highlight three key similarities. First, the value of the individual claims in this case are small, between $70 and $350; the claims in *Muhammad* were all for less than $600. This suggests that it

23

would be, in most cases, impractical to bring an individual claim for relief. *See Delta Funding Corp. v. Harris*, 912 A.2d 104, 115 (N.J. 2006) ("Harris has adequate incentive to bring her claim as an individual action. Not only are her damages substantial, but the fact that her home is at stake in the foreclosure proceeding makes it likely that she would contact an attorney. The same cannot be said of low-value claims where individuals have little, if any, incentive to seek out an attorney."). Second, there is little doubt that these contracts are adhesive consumer contracts; they were presented on a "take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Muhammad*, 189 N.J. at 15.[10] Finally, it is likely that here, "without the availability of a class-action mechanism, many consumer-fraud victims may never realize that they may have been wronged." *Id.* at 20. Most consumers would lack the necessary motivation to spend time looking into the costs associated with filing records in their county. Because these

---

[10] We recognize that Plaintiffs had the option to augment a few specific terms in the contract by, for example, asking for a pre-printed Arbitration Endorsement which would have required both parties to consent to arbitration. Based on the evidence presented to the District Court, this option was rarely, if ever, requested. Nonetheless, the ability to exercise this option in a real estate closing hardly provides support for the position that this is anything but a contract of adhesion. Indeed, *Muhammad* recognized that the ability to negotiate "on a few particulars" does not prevent a contract from being adhesive. 189 N.J. at 15.

24

similarities all evidence the same unconscionability concerns highlighted in *Muhammad*, we hold that any attempt by Defendants to compel bipolar arbitration prior to *Concepcion* would almost certainly have failed.[11]

Indeed, even the Plaintiffs at one point argued that under *Muhammad*, the contracts here would be unconscionable if read to prohibit class arbitration and compel bipolar arbitration. In a section of Plaintiffs' response to Defendants' motion to compel arbitration that is aptly titled "Under New Jersey Law Chosen by Defendants, a Requirement of Individual Arbitration of Plaintiffs' Claims Would be Unconscionable," the Plaintiffs explained that "[t]he factors identified by the Court in *Muhammad* as rendering the class action ban unconscionable are present here to the extent Defendants invoke their arbitration clause solely in order to prohibit any class action." Pl.'s Br. in Opp.

---

[11] While we readily acknowledge the concerns which the New Jersey Supreme Court has suggested necessitate a finding of procedural unconscionability, we need not opine on the public policy considerations inherent in deciding whether to enforce similar arbitration clauses because Congress has already made this difficult decision. As the Supreme Court made clear in *Concepcion*, "[t]he principle purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms." 563 U.S. at 344. And because the Supreme Court has decided that the FAA preempts contrary state law, we need not address this issue further.

25

to Joint Mot. to Stay, ECF No. 221 at *39. [12] While not giving this inconsistency any real weight, we simply note its existence.

_____

[12] This further highlights the key error the dissent makes when suggesting that the lack of a class arbitration waiver meaningfully distinguishes this case from *Muhammad*. The dissent argues that in our case, it is unlikely that a New Jersey court would have held the arbitration clauses unconscionable because the clauses could have been read to permit class arbitration (due to their lack of a class-arbitration waiver). While this is true, the right question to ask when assessing futility here is not whether the arbitration clauses, as a whole, would have been unconscionable. The question is whether a motion to compel bipolar arbitration would have been futile prior to *Concepcion*. Indeed, practically speaking, the dissent's approach to futility would lead to an absurd outcome in this case. In order to prevent waiver of Defendants' now-existing right to compel bipolar arbitration, Defendants' lawyers would have had to seek to enforce an arbitration agreement that they knew – or should have known – would almost certainly be read to allow Plaintiffs to arbitrate as a class. Accordingly, had they pursued arbitration in 2009, they would have been exposing their clients to the very real possibility that a multi-million dollar class action case would be decided by an arbitral panel; a procedural outcome far less preferable for Defendants than a class action in federal court. *See generally Concepcion*, 563 U.S. at 350 ("Arbitration is poorly suited to the higher stakes of class litigation." ); Jonathan R. Bunch, *To Be Announced: Silence from the United States Supreme Court and Disagreement Among*

26

IV.

We next address two minor issues. First, having concluded that the futility exception applies, we go on to excuse the pre-*Concepcion* delay and analyze the post-*Concepcion* delay under *Hoxworth*. Second, we consider the scope of the arbitration clauses here and conclude that their breadth makes it clear they encompass the New Jersey Consumer Fraud Act (NJCFA) claims that are contested on appeal.

A.

Because any attempt to compel bipolar arbitration in this case prior to *Concepcion* was almost certain to fail, we will disregard Defendants' pre-*Concepcion* delay[13] when

---

*Lower Courts Suggest an Uncertain Future for Class-Wide Arbitration*, 2004 J. DISP. RESOL. 259, 272 (2004) (explaining that class arbitration often seems to "bring[] the burdens of litigation into the arbitral forum" without bringing any of the benefits along with it). It would be a cruel joke to tell Defendants that they waived their right to bipolar arbitration by not seeking to enforce an arbitration agreement that would have almost certainly led to class arbitration.

[13] The length of the delay itself – if excused under the futility exception – is not relevant to our inquiry. Yet even were we to consider it, we note that delays of a similar length have been excused by the Eighth and Eleventh Circuits. *See Benoay v. Prudential-Bache Sec., Inc.*, 805 F.2d 1437, 1440 (11th Cir. 1986) ("Despite the fact that Bache and Stark's motion to compel arbitration was made two and one-half

determining whether waiver is appropriate. *See Miller*, 791 F.2d at 854 ("Subsequent to [the relevant change in the law], appellees delayed only two and a half months in making their request. Much of that delay is attributable to consolidation of the cases and appellant's filing of an amended complaint. In light of these facts, we find no waiver of the right to arbitrate.").[14] Plaintiffs also do not claim that they suffered any additional unfair prejudice apart from the costs associated with maintaining and prosecuting this case prior to *Concepcion*. *See generally Fisher*, 791 F.2d at 698 ("The Arbitration Act requires district courts to compel arbitration even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.").[15]

---

years after initiation of the civil action, we conclude that the motion was timely in light of a change in law affecting the parties' rights."); *Nesslage v. York Sec., Inc.*, 823 F.2d 231, 234 (8th Cir. 1987) (excusing two year delay).

[14] We also believe that our decision to excuse the delay and its resulting expense to Plaintiffs here is supported by the "'liberal federal policy favoring arbitration.'" *Concepcion*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24). We therefore leave it to courts in future cases to decide whether and how to apply futility outside of the arbitration context.

[15] In *In re California Title Insurance Antitrust Litigation*, No. CIV. 08-1341, 2011 WL 2566449 (N.D. Cal. June 27, 2011), a case practically identical to ours, Judge White concluded that the delay resulting from the belated invocation of arbitration as a defense was not unfairly prejudicial despite

Because we fully excused the pre-*Concepcion* delay, we consider only whether Defendants' approximately three-month delay between April 27, 2011 (when *Concepcion* was decided) and August 1, 2011 (when Defendants filed their motion to compel arbitration) was prejudicial to Plaintiffs. In doing so, we look to the *Hoxworth* factors outlined *supra* for guidance and conclude that waiver would be inappropriate for three reasons. First, Defendants notified Plaintiffs on June 8, 2011 – just over a month after *Concepcion* was decided – that they were demanding bipolar arbitration. This promptly put Plaintiffs on notice that a motion for arbitration was coming if the demand was rejected. Second, only three months passed

the fact that the case had been going on for over three years. Specifically, he noted, "[t]here is nothing in the record to support Plaintiffs' conclusory contention that granting the motion to compel arbitration would unfairly prejudice Plaintiffs." *Id.* at *3 (internal citations and quotation marks omitted). He then noted that the trial date was still over a year away and that only limited substantive discovery had taken place. We too are not convinced by Plaintiffs' allegations of prejudice here and, in light of the FAA's strong policy favoring arbitration, reject the argument that the litigation costs associated with a delay in this case can alone qualify as sufficient unfair prejudice to prevent application of the futility exception. *Cf. Martin v. Yasuda*, No. 15-55696, slip op. at *13 (9th Cir. July 21, 2016) ("A determination of whether 'the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements.'" (quoting *Fisher*, 791 F.2d at 694)).

between the accretion of the right and Defendant's motion to compel arbitration. This is not an unreasonable amount of time. Third, virtually no substantive or procedural litigation occurred during this delay. *Hoxworth*, 980 F.2d at 926-27.[16]

## B.

Finally, we note that the broad scope of the arbitration clauses here make it clear that we do not need to reach the viability of Plaintiffs' NJCFA claims.[17] The 1987 Owner's Policy states that "arbitration shall decide any matter in

---

[16] We also summarily reject Plaintiffs' argument that the Arbitration Endorsement was a mandatory addendum to every title insurance contract at issue here. Not only are the District Court's findings on this issue compelling, but we are also reviewing the court's factual findings for clear error, despite Plaintiffs attempt to dress up their argument as a matter of law by suggesting that the District Court ignored probative evidence. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). The District Court here properly considered and weighed the competing evidence and found the Defendants' position more compelling. This was not clearly erroneous.

[17] The scope of an arbitration clause is decided by the court absent clear and unmistakable evidence that the parties agreed to submit this issue to the arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 171 (3d Cir. 2014). We find no language in the contracts suggesting an intent that this issue be submitted to the arbitrator.

dispute between you and the Company," while the 1992 Loan Policy states that "[a]rbitrable matters include, but are not limited, to any controversy or claim between the company and the insured arising out of or relating to the policy . . . ." JA 33. As we held in *CardioNet*, when the plain language of an arbitration clause is clear, it controls. 751 F.3d at 173. We went further, however, and also concluded that if the language of the contract is ambiguous, "the presumption of arbitrability applies" because "[w]e must resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24-25). Thus, we have no doubt that the NJCFA claims raised here are subject to arbitration.

## V.

For the reasons previously articulated, we will remand this case to the District Court with instructions to compel bipolar arbitration of Plaintiffs' arbitrable claims in accordance with the District Court's May 14, 2015, order and this opinion.

*Chassen v. Fidelity National Financial, Inc. et al.*

No. 15-3789

---

**RENDELL**, <u>Circuit Judge</u>, <u>dissenting:</u>

The majority's opinion is flawed for a clear and obvious reason: it relies on caselaw that has no application here. Therefore, I must respectfully dissent.

In *Muhammad v. County Bank of Rehoboth Beach*, the New Jersey Supreme Court held that "the presence of the class-arbitration waiver in Muhammad's consumer arbitration agreement render[ed] that agreement unconscionable." 912 A.2d 88, 100 (N.J. 2006). Yet, despite the lack of a class arbitration waiver in the arbitration clauses here, the majority holds that a New Jersey court in 2009, at the outset of this case, would have found *Muhammad* controlling here. I reject that view, and urge you to read *Muhammad* and the actual arbitration clauses at issue here. Doing so will lead inexorably to one conclusion: this case is not *Muhammad*, and a motion by the Defendants in 2009 to compel arbitration thus would have been anything but futile. Moreover, the majority has expanded the concept of futility beyond what we as a court should recognize.

In *Muhammad*, the New Jersey Supreme Court considered whether to compel arbitration under an arbitration agreement in a payday loan contract that in no uncertain terms *prohibited* class arbitration. Specifically, in multiple places, the agreement required Muhammad to resolve all

1

disputes related to her payday loan transaction "by binding individual (and not class) arbitration." *Id.* at 92. The court held these waivers unconscionable under New Jersey law. According to the court, by forcing Muhammad to waive class arbitration in her case, which involved a small amount of damages, the arbitration agreement operated as an exculpatory clause, effectively releasing the lender from liability for possible statutory violations. *See id.* at 99–101.

Unsurprisingly, then, courts applying New Jersey law considered *Muhammad* to be relevant only when analyzing the unconscionability of class arbitration waivers. In *Homa v. American Express Co.*, for example, we examined an arbitration provision in a consumer agreement that required all claims to "be arbitrated on an individual basis . . . [with] no right or authority for any Claims to be arbitrated [as] a class action." 558 F.3d 225, 227 (3d Cir. 2009). After comparing this class arbitration waiver to the "similar class-arbitration waiver" at issue in *Muhammad*, we deemed it unconscionable under New Jersey law. *Id.* at 230–31; *see also*, *e.g.*, *Cohen v. Chase Bank, N.A.*, 679 F. Supp. 2d 582, 595 (D.N.J. 2010) (holding that the "the present class-action waiver" is unconscionable under *Muhammad*); *Davis v. Dell, Inc.*, No. 07-630 (RBK), 2008 WL 3843837, at *4 (D.N.J. Aug. 15, 2008) ("This Court finds that this case is distinguishable from *Muhammad*, and the class action waiver does not act as an unconscionable exculpatory clause.").

Here, the arbitration clauses—which are situated in the Loan Policies and the Owners' Policies—lack any sort of class arbitration waiver. The Loan Policies provide:

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy, and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy, shall be binding upon the parties.

J.A. 3981. And the Owners' Policies provide: "If it is permitted in your state, you or the Company may demand arbitration. The arbitration shall be binding on both you and the Company. The arbitration shall decide any matter in dispute between you and the Company." J.A. 3997. These clauses, quite obviously, do not even mention class arbitration, let alone outright prohibit it. If the Defendants had sought individual arbitration at the outset of the case, this silence might have been interpreted to mean that the parties simply

3

did not contemplate class arbitration. Or it might have been construed as permitting class arbitration.[1] Surely, it would not have been futile for them to move to enforce these clauses at that time.

Because the arbitration clauses here sit far outside the reach of *Muhammad*, as they are devoid of a class arbitration waiver, "'it should have been clear to the [Defendants in 2009] that the arbitration agreement[s] w[ere] at least arguably enforceable.'" *Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1278 (11th Cir. 2012) (quoting *Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 967 (8th Cir. 2009)). Indeed, the Defendants have cited not one case—let alone any controlling precedent in 2009—in which a court applied *Muhammad* and held as unconscionable an arbitration agreement that contained no class arbitration waiver or prohibition. *See id.* ("[A]bsent controlling . . . precedent foreclosing a right to arbitrate, a motion to compel arbitration will almost never be futile.").

The majority contends that it does not matter that the arbitration clauses here lacked class arbitration

---

[1] The majority claims that, had the Defendants moved to enforce the arbitration clauses in 2009, "they would have been . . . forced into class arbitration with near certainty." Majority Op. 18. I disagree. The majority bases that view on the flawed premise that these arbitration clauses implicated *Muhammad*. There simply is no class arbitration bar that would have been held unconscionable, and the clauses at issue could have been interpreted either way.

4

waivers. *See* Majority Op. 26 n.12. According to the majority, regardless of whether these clauses contained class arbitration waivers, given *Muhammad*, it would have been futile in 2009 for the Defendants to seek *individual* arbitration. It concludes that "a New Jersey court confronted with this case in 2009 would almost certainly have found *Muhammad* controlling and would have denied Defendants' motion to compel [individual] arbitration." *Id.* at 24.

That conclusion is simply wrong. The majority's analysis here fails to refer back to its own characterization of *Muhammad* as being animated by the explicit "class-arbitration bar," or "class-arbitration waiver," at issue there. Majority Op. 21, 22. This omission renders its conclusion not only arbitrary, but wrong.

Furthermore, contrary to the majority's position, the futility inquiry is *not* about disregarding the actual arbitration clauses at issue and asking the question—divorced from the arbitration clauses themselves—of whether "it would have been futile to move for [individual] arbitration under [*Muhammad*]." *Id.* at 19. No circuit court has ever framed the inquiry this way, and for good reason. As noted above, the futility inquiry sensibly focuses on the *enforceability of the actual arbitration clauses*—that is, would it have been futile in 2009 for the Defendants to move to enforce these clauses? *See, e.g.*, *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 719 (9th Cir. 2012) ("Our [futility] analysis begins with the [arbitration agreement] between Wells Fargo and the class

5

members."); *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 697 (9th Cir. 1986) ("Until the Supreme Court's decision in *Byrd*, the arbitration agreement in this case was unenforceable.").[2] Here, the answer is no.

But even if we were to pretend that these clauses contained class arbitration waivers so as to implicate *Muhammad*, a motion to compel individual arbitration in 2009 would have been far from futile. In *Muhammad*, the New Jersey Supreme Court did not hold that class arbitration waivers were "per se" unconscionable—far from it. 912 A.2d at 101. Rather, in holding that particular class arbitration waiver unconscionable, it articulated a "multi-factor analysis," one that necessitated a "fact-sensitive examination," for courts to apply when "evaluat[ing] claims of unconscionability." *Id.* at 97. A court must first determine whether the class arbitration waiver was part of a contract of adhesion. *Id.* at 96–97. If so, it must next consider (1) "the subject matter of the contract"; (2) "the parties' relative bargaining positions"; (3) "the degree of economic compulsion motivating the adhering party"; and (4) "the public interests affected by the contract." *Id.* at 97 (internal quotation marks omitted).

---

[2] The majority itself quotes this language from *Fisher*, *see* Majority Op. 14, but then analyzes the futility issue here in a manner totally divorced from the actual language of the arbitration clauses.

6

So, if we were to pretend *Muhammad* applied here, the Defendants could have easily argued that these arbitration clauses were not unconscionable. Most notably, they could have shown that these clauses were not part of contracts of adhesion, which would have obviated the need for the court to even consider the remaining factors. *See id.* ("The determination that a contract is one of adhesion . . . is the beginning, not the end, of the inquiry . . . ." (internal quotation marks omitted)). As noted by the majority in a footnote, the Plaintiffs "had the option" to "ask[] for a pre-printed Arbitration Endorsement which would have required both parties to consent to arbitration." Majority Op. 25 n.10. In other words, the Plaintiffs could have avoided being forced into arbitration. The Defendants thus could have established that these contracts were not ones of adhesion because the very terms at issue—the arbitration clauses—were *optional*, i.e., they were not "presented on a take-it-or-leave-it basis." *Muhammad*, 912 A.2d at 96; *see also Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 201 (3d Cir. 2010) (holding that an arbitration agreement was part of a contract of adhesion and thus procedurally unconscionable because the defendant "presented the arbitration agreement to [the plaintiff] for signature on a take-it-or-leave-it basis" (internal quotation marks omitted)). How, then, could it possibly have been futile in light of *Muhammad* for the Defendants to move to compel individual arbitration in 2009? I am baffled by the majority's conclusion that "there is little doubt" that the arbitration clauses at issue here were part of contracts of adhesion. Majority Op. 25.

7

The Defendants' inaction in 2009, and their about-face to seek arbitration in 2011, were no doubt driven by litigation tactics to derail the court proceedings. At the outset of the case, they realized that moving to compel individual arbitration under the arbitration clauses here, which were silent as to class arbitration, could have exposed them to class arbitration—a situation they admitted they "would never ever open [themselves] up for." Oral Arg. Tr. 20:37–41, July 14, 2016. That prospect then became unlikely when the Court decided *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* and rejected the idea that "the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." 559 U.S. 662, 687 (2010). Fueled by *Stolt-Nielsen*, they then seized the opportunity to cloak their delay under the veil of futility ostensibly afforded to them by *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). But the previous uncertainty as to class arbitration does not mean that it would have been futile in 2009 for them to move to enforce the arbitration clauses, which is the dispositive question here. It just means that they might not have succeeded in getting what they wanted: individual arbitration.

For these reasons, I respectfully dissent from the majority's opinion. It would have been far from futile for the Defendants to move to enforce these arbitration clauses in 2009. We should therefore consider only whether their belated attempt to do so prejudiced the Plaintiffs under the factors from

*Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912 (3d Cir. 1992). This analysis would undoubtedly lead to our finding that the Plaintiffs were prejudiced such that the Defendants waived their right to arbitrate. The Defendants did not just warm the bench for two and a half years before moving to compel arbitration. During that time, they repeatedly contested the merits of the Plaintiffs' claims, engaged in substantial non-merits litigation, and participated in extensive discovery that cost the Plaintiffs over $57,000. Under *Hoxworth*, this would not even be a close call. *See id.* at 925–26 (finding prejudice where the defendants waited eleven months to seek arbitration, participated in numerous pretrial proceedings, filed motions challenging the merits of the plaintiffs' claims, and took depositions).